563 F.2d 462
 183 U.S.App.D.C. 375
 Raymond C. RIESER, Administrator for the Estate and Personal
Representative of Rebecca A. Rieser
v.
DISTRICT OF COLUMBIA, Appellant, and Timothy Abron.
Raymond C. RIESER, Administrator for the Estate and Personal
Representative of Rebecca A. Rieser, Appellant,
v.
DISTRICT OF COLUMBIA et al.
 Nos. 76-1411 and 76-1412.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 25, 1977.
Decided Aug. 15, 1977.
Rehearing En Banc Granted and Panel Opinion Vacated Nov. 7, 1977.
 
 David P. Sutton, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel, Richard W. Barton and Robert L. Chernikoff, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellant in No. 76-1411 and appellee in No. 74-1412.
 Andrew L. Lipps, Washington, D. C., with whom Brendan V. Sullivan, Jr. and William W. Graham, Washington, D. C., were on the brief for appellant in No. 76-1412 and appellee Rieser in No. 76-1411.
 Before Mr. Justice CLARK,* of the Supreme Court of the United States, and MacKINNON and ROBB, Circuit Judges.
 Opinion for the Court filed by MacKINNON, Circuit Judge.
 MacKINNON, Circuit Judge:
 
 
 1
 Appellee's daughter, Rebecca A. Rieser, was raped and murdered by District of Columbia parolee who had been assisted by the District of Columbia Department of Corrections in obtaining employment at the apartment complex where she lived. Acting as her personal representative, appellee filed suit under the District of Columbia Wrongful Death Act, D.C.Code § 16-2701 to -2703, and the Survival Statute, D.C.Code § 12-101 (1973), against the owners of the apartment complex, the parolee, the parole officer, and the District of Columbia (District). A jury returned a verdict against the District under the Survival Statute for $201,633.00, and the district court entered judgment on this verdict and stipulated Wrongful Death damages of $2,764.30, but by remittitur reduced the Survival Statute award to $100,816.50. The District appeals, arguing (1) that the district court was without jurisdiction to entertain the action, (2) that the statutory notice requirements were not satisfied, and (3) that as a matter of law the facts do not establish that the District was liable on a negligence theory. Rieser cross-appeals, contending that the district court's dismissal of his claim for punitive damages was error. We affirm.
 
 I. FACTS
 
 2
 The rather remarkable facts of this case are now largely undisputed. Rebecca Rieser's assailant, Thomas W. Whalen, had a long history of assaults on women. In 1956, at age 13, he killed an elderly woman whom he accused of "exciting him sexually." He was found of unsound mind and civilly committed to St. Elizabeths Hospital for the insane. In 1962, while on conditional release from St. Elizabeths, Whalen assaulted a female cab driver. He was found criminally responsible for this act, convicted of robbery and assault with intent to commit rape, and sentenced in April 1962 to serve 6 to 18 years at Lorton Reformatory.[1] Whalen unsuccessfully applied for parole on two occasions. On April 20, 1970, he was examined by Dr. Louis Berman who diagnosed him as
 
 
 3
 a man who had a very poor upbringing and is now functioning at a dull normal level of intelligence. He is 26 years of age, tall and strong. His judgment is defective and his hostility is carefully repressed. He has not learned about his feelings nor how to deal with his negative feelings. I gathered also that he has very little support in the community.
 
 
 4
 I believe that when released to the community he will pose a serious potential danger. The only way I can see him going out into the community is on a trial basis . . . .[2]
 
 
 5
 During August 1971, Whalen was placed in a halfway house and employed by Government Employees Insurance Company (GEICO) as a maintenance worker. On September 10, 1971, he was paroled and subsequently employed at the Brentwood Village Apartments, again performing maintenance duties.[3] Timothy Abron was appointed Whalen's parole officer on November 31, 1971. By interviewing Whalen's supervisors, Abron learned that his work record in both jobs was satisfactory.[4] However, Whalen told Abron on February 14, 1972, that he, along with other employees, had become a suspect in the rape-murder of a woman and murder of her small child that occurred during his employment at Brentwood Village.[5]
 
 
 6
 On February 28, 1972, because his supervisor subjected him to "undue pressures,"[6] Whalen quit his position at Brentwood Village. Abron then referred Whalen to the Employment Counseling Service (ECS) of the District of Columbia Department of Corrections, which assists parolees to find employment. On the referral form, which asked only for the parolee's adult criminal record, Abron indicated that Whalen had been convicted of robbery but neglected to mention the attempted rape conviction. The form also did not mention Whalen's prior commitment to St. Elizabeths, current psychiatric evaluation, juvenile offenses or status as a suspect in the Brentwood murders.[7]
 
 
 7
 Before Whalen had been placed for employment, Abron was approached by a Metropolitan Police detective who informed Abron that Whalen had refused to take a polygraph test in connection with the police investigation of the Brentwood murders, and solicited Abron's help in getting Whalen to take the test.[8] On March 1, 1972, Abron sent a memorandum through his supervisor to the parole board discussing Whalen's status as a suspect, his refusal to take the test, and the recent diagnosis of Whalen by Dr. Berman.[9] Abron later met with detectives concerning the investigation.
 
 
 8
 On March 21, 1972, when Whalen had not yet been placed for employment, Abron and Whalen together visited the Counseling Service and spoke with an employment counselor. Abron told the counselor that in his opinion, based on Whalen's work record, Whalen would be a good employee. Abron placed no limitations upon the types of work he considered appropriate for Whalen, and did not tell the counselor or ECS about Whalen's "murder or rape" offenses or his status as a suspect in the Brentwood Village murders.[10]
 
 
 9
 Whalen was referred by the counselor to McLean Gardens[11] and was hired by them on March 21, 1972, as a maintenance worker.[12] The next day, Abron was called by a detective and told that Whalen was a "prime suspect" in the Brentwood murders because of his past record and the fact that there had been a complaint that he had used "phony excuses" to get into apartments in Brentwood Village.[13] On March 23, Abron testified, he visited McLean Gardens and told McKinley Walker, the McLean Gardens maintenance superintendent, that Whalen had been convicted of "robbery and rape" and that he was not to be given keys or permitted to work in the apartments or by himself.[14] Walker testified, however, that he was not at that time told either of the convictions or of the restriction against inside work, but did remember telling Abron that Whalen would not be working alone.[15]
 
 
 10
 Abron subsequently learned that Whalen was a suspect in a third Brentwood Village murder, involving a sixteen-year old girl. In a March 27, 1972, memorandum through his supervisor, Abron recommended to the parole board that it revoke Whalen's parole.[16] The parole board declined, in view of the absence of "hard facts" of Whalen's guilt, and Whalen remained in his position at McLean Gardens.[17] Abron testified: "The only action the Board took was to inform me to supervise the man closely."[18]
 
 
 11
 All reports on Whalen's work were favorable. He was promoted to apartment cleaner, and then to repair helper. He was sometimes assigned to work alone and given the keys to apartments.[19] While Walker did not inform Abron of this change in assignment,[20] Whalen told Abron on April 21, 1972, that he was doing carpentry, plumbing and electrical work and had received a pay increase. Abron testified that he did not believe or seek to confirm Whalen's report that he was doing inside work, and that Abron had visited McLean Gardens on several occasions but never saw Whalen working inside a building.[21]
 
 
 12
 On May 30, 1972, Metropolitan Police detectives visited the home of Milton Carrick, the general manager of McLean Gardens. During the visit the police informed Carrick of Whalen's entire criminal record, the adverse psychiatric evaluation, and the fact that Whalen was a suspect in the Brentwood Village murders. Police also stated that Whalen had made no attempt to clear himself, and suggested a meeting at which police would confront Whalen with the evidence against him.[22] The next day, a meeting was held in Carrick's office attended by Carrick, Walker, Whalen, Detective Chaney and another detective. Chaney reviewed Whalen's entire criminal record and the psychiatric evaluation, and told him that he was the "prime suspect" in the Brentwood murders as a result of reports of his entering apartments without authorization. Whalen still refused to make a statement to the police. As Whalen was leaving the room, he asked Carrick, "Do I still have a job?" Carrick replied, "Yes, you still have a job."[23] Chaney testified:
 
 
 13
 When I was leaving I said, "Mr. Carrick, you had better have somebody watch him." I said, "Don't let him have any keys." I said, "Have somebody watch him." I said, "If you have anyone dead here in the next few months, you will know who is responsible for it."[24]
 
 
 14
 On June 1, 1972, both Detective Chaney and Whalen told Abron of the McLean Gardens meeting. Chaney then arranged for Whalen's attendance at a meeting of the parole board designed to assist in the police investigation.[25] Abron, Chaney, the Acting Chief Parole Officer, and Whalen attended the meeting. Whalen's history was reviewed and it was again pointed out that he was a "prime suspect" in the Brentwood investigation. He was told to report to police headquarters for interrogation, given a Miranda warning, and told that he had a right to counsel at the interrogation. Whalen appeared at the police station, but refused to take a polygraph test and made a statement the police considered unsatisfactory.[26] The parole board again took no action other than ordering Whalen to "continue close supervision."[27]
 
 
 15
 On July 25, 1972, Whalen's case was transferred to another parole officer, James E. Newman. Newman became generally familiar with the case but could not recall being told about the work restrictions, and assumed that Whalen was working inside as well as out. He observed nothing that would justify a recommendation to the parole board that Whalen be removed from his employment or his parole terminated.[28]
 
 
 16
 Walker still considered Whalen's work to be satisfactory, could not recall being informed of any work restrictions placed on Whalen, and saw no reason to place restrictions on his work.[29] Whalen thus continued to work inside apartments. Walker was aware that Whalen, like other employees, sometimes remained around McLean Gardens while off-duty and occasionally did work for tenants.[30] On Sunday, September 10, 1972, the Assistant Superintendent, Benjamin Sanders, gave Whalen permission to purchase some furniture discarded from one of the McLean Gardens buildings, and authorized another worker to drive the furniture to Whalen's home in McLean Gardens truck.[31] That day, Whalen entered Rebecca Rieser's room, where he raped and strangled her.[32]
 
 II. THE LITIGATION
 
 17
 On June 6, 1973, Raymond G. Rieser, as the personal representative of Rebecca Rieser, filed suit in the district court[33] against CBI Fairmac Corporation, the owners of McLean Gardens,[34] charging that the negligence of its agents had resulted in the death of his daughter, and against Whalen for his intentional tort. Jurisdiction was based on diversity of citizenship, 28 U.S.C. § 1332 (1970). On August 7, 1973, CBI Fairmac filed a third-party complaint for indemnification against the District of Columbia and Abron, charging that Abron's negligent or intentional withholding of information concerning Whalen's background had induced McLean Gardens to hire Whalen. On August 31, 1973, Rieser filed a separate action against the District of Columbia and Abron, similarly pleading that as a result of his acts Abron was liable in negligence and misrepresentation, and that he had acted within the scope of his employment.[35] Without making any distinction between the two defendants, Rieser invoked the district court's diversity jurisdiction.[36] He simultaneously moved that the two actions be consolidated. This motion was granted, and the consolidated cases were assigned for trial by a jury.[37]
 
 
 18
 Prior to trial, the District and Abron moved for summary judgment to deny Rieser's claim for punitive damages. This motion was granted by the district court without comment on September 4, 1975.[38] On the morning trial commenced, September 10, 1975, Fairmac settled Rieser's claim against it for $150,000 in compensatory damages and $500,000 in punitive damages. Pursuant to the settlement, the court dismissed Rieser's complaint against Fairmac and Fairmac's third-party complaint against the District, and by Rieser's motion dismissed as to both Whalen and Abron. The district court denied the motions of the District to dismiss the action for failure to satisfy the statutory notice requirement of D.C.Code § 12-309 (1973), and for lack of jurisdiction over the claim against the District after the claim against Abron was dismissed.[39]
 
 
 19
 The jury returned a verdict against the District under the survival statute in the amount of $201,633.00, and judgment was entered on this verdict on September 17, 1975. In a memorandum and order dated February 10, 1976, the court denied the District's post-trial motions for relief of judgment, for judgment notwithstanding the verdict and for a new trial. It did, however, grant in part the District's motion for a remittitur, reducing the amount of compensatory damages to $100,816.50 "in order to account for compensatory damages by the settling defendant."[40] The court also entered judgment against the District for $2,764.30 in stipulated damages under the Wrongful Death Act.
 
 III. JURISDICTION
 
 20
 Rieser based his complaint against the District and Abron on the district court's diversity jurisdiction, 28 U.S.C. § 1332 (1970), alleging that he was a citizen of Pennsylvania,[41] that Abron was a citizen of Maryland and an employee of the District of Columbia, and that the amount in controversy exceeded $10,000. The District did not dispute these factual allegations, but contended in motions during and after trial that the district court was deprived of subject matter jurisdiction when Rieser's claim against Abron was dismissed on the morning of trial. The district court denied both motions, and explained in its memorandum of February 10, 1976, (1) that the district court had jurisdiction over the claim against the District pendent to the claim against Abron, and that this pendent jurisdiction over the District survived the dismissal of the claim against Abron, and (2) in the alternative that a citizen of a state could bring suit directly against the District under section 1332. On appeal, the District challenges both of these conclusions.
 
 A. Pendent Jurisdiction
 
 21
 The district court asserted subject matter jurisdiction over the claims against the District primarily on the theory of pendent party jurisdiction, together with its conclusion that dismissal of the claims against Abron would not defeat this jurisdiction.
 
 
 22
 Pendent jurisdiction has most frequently been exercised by the federal courts over state law claims which are "pendent" to claims arising under federal law. The Supreme Court has held that it is within the sound discretion of the district courts to exercise such jurisdiction where the claims "derive from a common nucleus of operative fact" or the plaintiff "ordinarily (would) be expected to try (the claims) all in one judicial proceeding." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). This power is to be exercised where warranted by considerations of judicial economy, convenience and fairness to litigants. 383 U.S. at 726, 86 S.Ct. 1130.
 
 
 23
 A number of courts have also exercised pendent jurisdiction over parties in diversity cases against whom the jurisdictional requirements have not been satisfied.[42] This basis for jurisdiction has been recognized only where the requirements of Gibbs have been met and, in addition, the joinder of the pendent party would not violate the rule of complete diversity enunciated in Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). This rule, however, means only that no plaintiff may be a citizen of the same state as any defendant. Thus, pendent party jurisdiction has been exercised over a claim against a "stateless" party that was pendent to a claim against a diverse party. Twentieth Century Fox Film Corp. v. Taylor, 239 F.Supp. 913 (S.D.N.Y.1965).
 
 
 24
 In Moor v. County of Alameda, 411 U.S. 693, 710-17 & n.29, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), the Supreme Court noted that most circuit courts had approved, and only one disapproved, the exercise of pendent party jurisdiction and assumed arguendo that such jurisdiction was proper. It held, however, that the district court's refusal to exercise pendent party jurisdiction over a claim against a county was not an abuse of discretion. The Court also held that the district court did not have diversity jurisdiction over the county since under California law the county was not a "citizen" of the state but rather an agency of the state itself,[43] and that the county was not a suable "person" under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 (1970).
 
 
 25
 The Court again confronted pendent party jurisdiction in Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). In Aldinger the plaintiff had filed a claim under sections 1343(3) and 1983 against a county and its officials, arguing that the district court had pendent party jurisdiction over the county. The Court traced the history of pendent jurisdiction and concluded that
 
 
 26
 the question of pendent-party jurisdiction is "subtle and complex," and we believe it would be unwise as it would be unnecessary to lay down any sweeping pronouncement upon the existence or exercise of such jurisdiction. Two observations suffice for the disposition of the type of case before us. If the new party sought to be impleaded is not otherwise subject to federal jurisdiction, there is a more serious obstacle to the exercise of pendent jurisdiction than if the parties already before the court are required to litigate a state-law claim. Before it can be concluded that such jurisdiction exists, a federal court must satisfy itself not only that Art. III permits it, but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence.[44]
 
 
 27
 In applying these two tests to the case before it, the Court concluded that the "general contours" of Article III posed no problem. It held, however, that since Congress had declined to include counties as suable "persons" under section 1983, the Congress had "by implication declined to extend federal jurisdiction over" the county as a pendent party under section 1343(3).[45]
 
 
 28
 The District argues that although its holding is not directly controlling,[46] the rationale of Aldinger requires a similar result here. As in that case, the "general contours" of the Article III grant of jurisdiction over "all Cases . . . arising under . . . the Laws of the United States" do not bar pendent jurisdiction over the District. The District contends, however, that the terms of 28 U.S.C. § 1332 "by implication" negate that jurisdiction. Section 1332 provides:
 
 
 29
 (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between
 
 
 30
 (1) citizens of different States;
 
 
 31
 (d) The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.
 
 
 32
 Since it is well settled that section 1332(a) does not extend diversity jurisdiction to suits against states and their subdivisions,[47] the District contends, the equation of the District with a "state" in section 1332(d) implies a decision not to extend diversity jurisdiction to suits against the District. Under Aldinger, such a congressional decision would also bar the exercise of pendent jurisdiction.
 
 
 33
 The legislative history of section 1332(d), however, belies the District's argument. The Judiciary Act of 1789 had created the federal courts and given them original jurisdiction over suits "between a citizen of the State where the suit is brought, and a citizen of another State."[48] The Supreme Court, in Hepburn & Dundas v. Ellzey, 6 U.S. (2 Cranch) 445, 452-53, 2 L.Ed. 332 (1805) held that a citizen of the District of Columbia was not a "citizen ( ) of (a) State( )" within the meaning of the diversity statute.[49] This bar against diversity suits by and against residents of the District stood for 135 years, until the enactment of a 1940 amendment to the Judiciary Act.[50] The 1940 amendment extended federal diversity jurisdiction to include controversies between "citizens of different states, or citizens of the District of Columbia, the Territory of Hawaii, or Alaska, and any State or Territory." The House Report states the single intent of the amendment:
 
 
 34
 The purpose of this bill is to extend original jurisdiction to Federal district courts in civil suits between citizens of the District of Columbia, the Territories of Hawaii or Alaska, and any State or Territory. It gives the citizens of the District of Columbia the same right to bring a suit in Federal district court of any State on the ground of diversity of citizenship as now obtains in the case of a citizen of a State.[51]
 
 
 35
 This sole legislative purpose was also noted by the plurality in National Mutual Insurance Co. v. Tidewater Transfer Co., 337 U.S. 582, 603, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949), upholding the constitutionality of the amendment.[52] While a fair reading of the language and history of the 1940 amendment does not reveal a congressional intent to confer diversity jurisdiction in suits against the District and the territories, nothing in the statute or the legislative history expresses any intent to negate federal court jurisdiction over such suits on a pendent theory. A clarifying 1948 amendment that produced the present language of section 1332 does not reveal any different intent.[53] Rather, it is clear that the Congress intended by the amendments simply to permit suit by and against citizens of the District and the territories.
 
 
 36
 That section 1332, as amended, might not grant the federal courts diversity jurisdiction in such suits is not dispositive of the question of pendent jurisdiction. On the contrary, the very exercise of pendent jurisdiction depends upon the conclusion that the federal court has no direct jurisdiction over the case.[54] The Court in Aldinger held that pendent party jurisdiction may not be exercised where such jurisdiction has been expressly or impliedly negated by Congress; we conclude that section 1332 does not expressly or impliedly negate the district court's exercise of pendent party jurisdiction over the District of Columbia. Aldinger thus poses no bar to the exercise of pendent jurisdiction by the district court in the present case, and it remains only to consider whether the other jurisdictional requirements have been fulfilled.
 
 
 37
 We conclude that the other prerequisites to the exercise of pendent jurisdiction by the Court have likewise been satisfied. Joinder of the District in the suit against Abron did not destroy complete diversity. It was undisputed that Rieser was a citizen of Pennsylvania and Abron was a citizen of Maryland. Even if the District is not a "citizen( ) of (a) State( )" within the meaning of section 1332(a)(1), it is not a citizen of the same state as Rieser. It would thus be a "stateless" party whose joinder does not destroy complete diversity.[55]
 
 
 38
 The claim against the District was based upon the conduct of Abron under the theory of respondeat superior. There thus was no serious question that the claims "derive(d) from a common nucleus of operative fact" and were "such that he would ordinarily be expected to try them all in one judicial proceeding . . . ."[56] The district court's exercise of jurisdiction was also fully justified by the "considerations of judicial economy, convenience and fairness to litigants . . . ."[57] Dismissal at this late stage would require duplicative relitigation in the Superior Court at a great cost in time and expense to the parties and that court. Throughout discovery and pretrial proceedings, the District assumed that jurisdiction over the claim against it properly lay in the district court on a pendent party theory; the jurisdictional issue was not raised until the claims against Abron were dismissed and trial had already begun. Exercise of pendent jurisdiction thus resulted in no unfairness to the District, and refusal to exercise such jurisdiction might well have been substantially unfair to Rieser.
 
 
 39
 Finally, the dismissal of Abron, which prompted the District to argue that the district court had lost jurisdiction over the case, did not have that effect. On the contrary, the District does not now dispute that once pendent jurisdiction has properly attached, such jurisdiction can in the sound discretion of the trial court survive the dismissal of the claim to which it appends.[58] We find no abuse of discretion in the district court's retention of jurisdiction over the District after dismissal of the claim against Abron.
 
 
 40
 For the foregoing reasons, we conclude that the district court properly exercised pendent jurisdiction over the claim against the District of Columbia.
 
 B. Other Jurisdictional Theories
 
 41
 In the alternative, the district court held that it had direct jurisdiction over the claims against the District on the basis of diversity of citizenship. This holding was based upon the district court's reasoning that the District of Columbia is a municipal corporation, D.C.Code § 1-102(a) (Supp. IV 1977), and that like other municipal corporations it is subject to suit under the diversity jurisdiction of the federal courts.[59] Rieser supports this conclusion, arguing that the District particularly possessed the characteristics of a municipal corporation on August 31, 1973, when the complaint was filed, before the advent of "home rule" under the District of Columbia Self-Government and Governmental Reorganization Act.[60] We note that the statute on its face poses some difficulty with this conclusion. Section 1332(a)(1) establishes federal diversity jurisdiction over suits between "citizens of different States." Whether or not the District is or was a "municipal corporation," the statute appears to require that it be a "citizen( ) of (a) State( )" for federal diversity jurisdiction to attach. While section 1332(d) defines the District as a "state" for the purpose of the diversity statute, the District would arguably have to be a "citizen" of itself to fit within section 1332(a).[61] Since we have concluded above that section 1332(d) does not negate the exercise of pendent jurisdiction over the claim against the District, and that the district court otherwise properly exercised such jurisdiction, we need not resolve the more difficult question of whether section 1332(a) affirmatively grants diversity jurisdiction over claims against the District of Columbia.
 
 
 42
 Neither do we resolve the question, raised by Rieser only on appeal, of whether the district court had jurisdiction over the claim against the District ancillary to the claims earlier filed against Whalen and CBI Fairmac.[62]
 
 IV. SUIT AGAINST THE DISTRICT OF COLUMBIA
 
 43
 Rieser's suit raises two threshold issues posed by the legal status of the District of Columbia. The first is the general question of sovereign immunity, while the second arises from a specific statutory notice requirement for suits against the District.
 
 A. Sovereign Immunity
 
 44
 Congress in 1871 constituted the District of Columbia "a body-corporate for municipal purposes," which may "sue and be sued, . . . and exercise all other powers of a municipal corporation not inconsistent with the Constitution and laws of the United States and the provisions of (the District of Columbia Code."[63] The Supreme Court early interpreted this language to limit the sovereign immunity of the District to that of an ordinary municipal corporation of a state.[64] The courts of this jurisdiction initially held that the district and its officers were subject to suit for acts in connection with "proprietary" functions of the District, but immune from liability for injuries arising out of the District's "governmental" activities.[65] This older "governmental-proprietary" test has relatively recently been rejected in favor of the more workable distinction between "discretionary" and "ministerial" acts. It is now settled that a District officer, and the District when sued for the acts of an officer under the theory of respondeat superior, are protected by sovereign immunity if the officer's acts are "discretionary," but subject to liability if the acts were "ministerial" in character.[66] At issue in this case is the proper characterization of parole officer Abron's acts.
 
 
 45
 The courts generally define "discretionary" acts as those involved in the formulation of policy, while "ministerial" acts are defined as those related to the execution of policy.[67] Determining which official acts involve policymaking and which involve only implementation sometimes presents a difficult problem of line-drawing. To aid in this determination, this court has developed a touchstone: An action will be considered "discretionary" only if the prospect of liability for the decisions the officer must make in the course of his performance would unduly inhibit the officer's ability to perform his function.[68]
 
 
 46
 Whatever the problems of line-drawing potentially raised by this doctrine, we conclude that Abron's acts in the present case were "ministerial." Abron was not involved in the formulation of policy, but in the execution of policy as it affected an individual parolee. He was under a clear duty, defined by Department of Corrections policy, to disclose Whalen's full adult record in the referral form. Abron was similarly under a duty to provide adequate supervision for Whalen's parole. Potential liability for the negligent performance of these duties will not deter parole officers from performing them, but rather will encourage conscientious performance. Abron's actions in filling out the referral form, and in determining precisely when and how to speak to Whalen and his supervisors, were no less ministerial than the decision of a police officer to make an arrest,[69] the decisions of police officials in training and supervising police officers,[70] or the decisions of medical personnel at a public hospital in determining the proper course of treatment for a patient.[71] Rieser's action against the District of Columbia was therefore not barred by sovereign immunity.[72]
 
 B. Statutory Notice
 
 47
 While the District and its officers engaged in "ministerial" acts are thus unprotected by sovereign immunity, the Congress has interposed an additional procedural requirement for suit against the District, not applied to suits against other defendants. The District argues that Rieser failed to comply with this statutory requirement. D.C.Code § 12-309 (1973) provides:
 
 
 48
 An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Commissioner of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.
 
 
 49
 Rieser gave no express written notice of any claim. The district court, however, found the requirement satisfied by police reports incident to Whalen's arrest for the Rieser murder, and by letters from the Department of Corrections and Parole Board to other District officials, including the mayor.[73] Counsel for the District conceded that these reports had provided the District notice of the "time, place, . . . and circumstances of the injury."[74] The District contended, however, that it was not afforded notice of the causal connection between the injury and any negligent acts of its agents, and that it was entitled to but did not receive timely notice of Rieser's intention to bring suit. The statute, however, does not so provide. In its brief before this court, the District restates its argument somewhat: The District contends that it must have notice of "circumstances" giving rise to its liability. The "key circumstances" of Rieser's claim, the District argues, were (1) a failure to disclose fully Whalen's criminal background, and (2) a failure to provide adequate parole supervision. The District concludes that nothing in the police reports satisfied the notice requirement with regard to these crucial matters, and that the post-arrest letters cannot be considered because section 12-309 expressly mentions only police reports. We find that the police reports provided the District notice of the principal facts sufficient to lead it to those related facts which were peculiarly within its possession, and that the requirements of section 12-309 were satisfied.
 
 
 50
 The intent of section 12-309, recognized by the District in its brief, is to require that potential plaintiffs give the District "reasonable notice" so that it may investigate and ascertain the facts which may give rise to its liability.[75] The police report exception is designed to provide for instances in which the District has actual notice.[76] The police report need contain only the specificity that would be required of a written notice,[77] and a "full detailed official report" by the police, setting out the "approximate time, place, cause, and circumstances of the injury," section 12-309, satisfies the statutory requirement.[78]
 
 
 51
 In the present case, it is undisputed that the police report correctly indicated the time and place of the rape and murder, the identities of Rebecca Rieser, her parents, and Whalen, and the fact that Whalen was a District of Columbia parolee working at McLean Gardens.[79] The letters in the record, if not themselves amounting to "notice" cognizable under section 12-309, conclusively show that the District had actual notice of the way in which all of these facts interacted to give rise to the District's potential liability. The District does not contend that it was deprived of an opportunity to investigate the matter further, and indeed, the letters suggest that a further investigation was undertaken.[80] The District has cited no support for the broad construction that it urges for the statutory words "cause" and "circumstances," and our review of the cases and the legislative history reveals none.[81] In addition, nothing in the statute or the case law requires that the plaintiff give notice of intent to bring suit. On the facts of the present case, we conclude that the requirements of section 12-309 were clearly satisfied.
 
 V. NEGLIGENCE
 
 52
 Threshold issues resolved, we proceed to the questions of substantive liability. The district court's submission of the question of compensatory damages to the jury rested upon its conclusion that a prima facie case had been made out that the District owed a duty to Rebecca Rieser and that a breach of this duty proximately caused her death. The District argues that each of these conclusions was in error.
 
 A. Duty
 
 53
 The District argues that as a matter of law it owed no duty to Rebecca Rieser actionable in tort, and that therefore the district court should not have allowed the case to go to the jury. An actionable duty is generally owed to reasonably foreseeable plaintiffs subjected to an unreasonable risk of harm by the actor's negligent conduct.[82] However, because of the large number of persons who could be injured as a result of the defective provision of public services, a special application of the rule has developed. Governmental units are sometimes held to owe no duty to members of the general public for injuries arising out of the negligent provision of services designed to benefit the community at large. This doctrine is applied apart from that of sovereign immunity, so that there may be no actionable duty even if the acts involved are "ministerial."[83]
 
 
 54
 This rule has been articulated most often in cases involving suits by members of the public seeking recovery for injuries resulting from inadequate police protection. For example, municipalities have been held to owe no duty to motorists injured by reckless drivers the police failed to arrest,[84] and to merchants forced out of business by a crime wave the police failed to stop.[85] In Gerneth v. City of Detroit, 465 F.2d 784 (6th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 913, 34 L.Ed.2d 690 (1973), a decision upon which the District heavily relies, the city had licensed a private security guard, failing to discover that the guard had been convicted of the felony "careless use of firearms" and was thus ineligible for the license. The guard shot and injured Gerneth. The district court dismissed Gerneth's suit against the city, and the Sixth Circuit affirmed.[86]
 
 
 55
 The courts have, however, recognized an exception to the general rule of government nonliability for negligent omissions in the provision of public services. An actionable duty is found to exist where a special relationship has been established between the governmental unit and the plaintiff. For example, in Hicks v. United States, 167 U.S.App.D.C. 169, 511 F.2d 407 (1975), St. Elizabeths Hospital released a patient that it was aware had previously threatened and assaulted his wife. The former patient murdered his wife, and this court held that on these facts St. Elizabeths had a "particular duty" to her and to the Court of General Sessions.[87] Recovery was allowed under the District of Columbia Survival Statute and the Federal Tort Claims Act.[88] In Johnson v. State, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968), a parole officer placed a dangerous juvenile parolee in a foster home, failing to warn the foster parents of his violent tendencies. The California Supreme Court held both that the parole officer had an actionable duty to warn the injured foster mother of such latent character defects, and that the parole officer's actions were unprotected by sovereign immunity. Other courts have held the government to have a "special duty" to protect informants in criminal cases.[89]
 
 
 56
 We find the rationale of these decisions to be controlling here. Abron's position as a parole officer vested in him a general duty to reveal to a potential employer Whalen's full prior history of violent sex-related crimes against women, and to ensure that adequate controls were placed on his work. Placement of Whalen in a maintenance position at McLean Gardens put him in close proximity to the women tenants, with the opportunity to observe their habits, and gave him potential access to the keys to their apartments and dormitory rooms. As did the assailants in Hicks and Johnson, Whalen became a virtual member of the victim's household. The jury could conclude that a breach of Abron's general duty would present a specific and unreasonable risk of harm to the women tenants of McLean Gardens therefore giving rise to a special duty toward them. On this theory, it was not error to allow the question of liability to go to the jury.[90] As the New York Court of Appeals has stated, "To uphold such a liability does not mean that municipalities are called upon to answer for every loss caused by outlaws or by fire."[91]
 
 B. Proximate Cause
 
 57
 The District also argues that whatever its initial duty to disclose Whalen's background and to supervise his parole, the intervening negligence of McLean Gardens in retaining Whalen in their employ after all of the facts were known to them cut off the liability of the District as a matter of law. Even if the district court properly submitted to the jury the question of the District's liability for the continuing failure to supervise, it further contends, the court should not have permitted the jury to consider liability for the initial failure to disclose.[92]
 
 
 58
 The question of proximate causation, like that of duty, is at base one of foreseeability. If a negligent, intentional or even criminal intervening act or end result was reasonably foreseeable to the original actor, his liability will not ordinarily be superseded by that intervening act. In such circumstances, the two acts are usually concurrent causes of the injury.[93] A third party normally has no duty to prevent harm threatened to the victim by the first actor's negligent conduct.[94] However, in "exceptional cases," the responsibility for the harm may be shifted to the third party who fails to act.[95]
 
 
 59
 The Restatement (Second) of Torts § 452(2) (1965) suggests that the duty and responsibility may shift because of "lapse of time," but the examples in the Comments deal almost entirely with cases in which the liability shifted pursuant to a contract between the actors. Professor Prosser states that liability may shift where "a third person becomes aware of the danger, and is in a position to deal with it,"[96] and the District cites a number of cases in other jurisdictions that it argues have adopted this rule.[97] Proximate causation, including the question of superseding cause, however, is ordinarily a question of fact for the jury.[98]
 
 
 60
 We conclude that the facts of the present case are not so " exceptional" in this regard that the district court was bound to hold as a matter of law that the conduct of McLean Gardens superseded Abron's negligence either in initially failing to disclose or in failing adequately to supervise Whalen's parole. The jury could reasonably have found that McLean originally hired Whalen because it believed that he had committed only robbery, and that otherwise Whalen would not have had an opportunity to build up the satisfactory work record that induced McLean to keep him on even after they became aware of his full background. It similarly could have found that Abron's continuing failure to provide adequate supervision not only contributed to the absence of controls that resulted in Rebecca Rieser's death, but also permitted the assignment of Whalen to increasingly responsible jobs and thus was in part a contributing cause to McLean's decision not to terminate his employment.[99] This failure of supervision continued to the time of Rebecca Rieser's death. On these facts, the district court properly submitted the question of causation, on both theories, to the jury.
 
 VI. PUNITIVE DAMAGES
 
 61
 Rieser cross-appeals, challenging the district court's order granting, without comment, the District's motion for summary judgment on his claim for punitive damages.[100] The parties agree that the case is controlled by the leading case concerning the award of punitive damages against the District, Smith v. District of Columbia, 336 A.2d 831 (D.C.App.1975) (per curiam). The District of Columbia Court of Appeals there noted that "(t)he clear weight of authority in the states is that as a general rule there can be no recovery of punitive damages against a municipality absent a statute expressly authorizing it. There is no such statute in this jurisdiction."[101] The court concluded in that case, an action for false arrest, that "(a)bsent extraordinary circumstances, not present here, we agree with the weight of authority and conclude that the District of Columbia is not liable for punitive damages."[102] Rieser contends that the Smith case means that the District should be held liable for punitive damages under "extraordinary circumstances," and that such circumstances are present in this case. In view of the dearth of facts set out in support of the District's motion for summary judgment on the punitive damages claim,[103] he argues, the district court must have erroneously concluded that the District could not be liable for punitive damages under any circumstances.
 
 
 62
 Rieser suggests that the Smith court's reference to "extraordinary circumstances" means simply that the conduct must have been more than an isolated instance, and that the award would satisfy the deterrent purposes of such an award. In reaching its result, the Smith court did note that the deterrent rationale of punitive damages poses two problems when such an award is sought against a municipality.[104] First, a judgment that will in practice be paid by the city might not deter individual employees from repeating the tortious conduct. Second, the need for punitive damages will normally be reduced by the fact that disciplinary measures would be taken against the offending employee. The Smith court, however, also noted that such awards would pose two additional problems unique to governmental bodies and not directly related to the deterrent purpose of punitive damages. First, the public that would benefit from the deterrence to be achieved by punitive damages would also be forced to pay the award through its taxes. Second, the "unlimited" taxing power of the city would confound the jury in its assessment of an appropriate punitive damages award. These considerations indicate that the District of Columbia Court of Appeals, when it left open the possibility of a punitive damages recovery against the District in "extraordinary circumstances," intended that something more be shown than that the "deterrent rationale" of punitive damages would be satisfied. Even assuming arguendo that the conduct of the parole officers in the present case might show such flagrant disregard of the rights of others as to justify an award of punitive damages against them as individuals, we doubt that the conduct is sufficiently "extraordinary" as to justify an award against the District under Smith. While a reasonable juror could have concluded from the facts that the officers had breached their duty to disclose Whalen's background and to supervise his parole adequately, they nevertheless made some efforts to fulfill their proper functions. Abron in particular attempted to place work restrictions on Whalen and attempted on several occasions to observe Whalen to determine if these restrictions were being observed.
 
 
 63
 We need not, however, determine the outlines of the "extraordinary circumstances" that might permit a punitive damages award against the District of Columbia. Facts were absent in the present case that would have permitted the award of punitive damages even against an ordinary corporation. A punitive damages recovery against a corporation requires proof that the corporation's high officers either participated or acquiesced in the employee's tortious conduct.[105] In the record in the present case, there is no indication that the higher officers of the District government either participated in or ratified the misfeasance of Abron and Newman. On the contrary, the actions of the parole officers were in contravention of specific District policy. The entry of summary judgment for the District on the count seeking punitive damages was therefore not error.
 
 
 64
 For all of the foregoing reasons, the judgment of the district court is
 
 
 65
 Affirmed.
 
 
 66
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 
 ORDER
 
 67
 PER CURIAM.
 
 
 68
 Upon consideration of the petition for rehearing and/or suggestion for rehearing en banc filed by appellant District of Columbia, it is
 
 
 69
 ORDERED by the Court, en banc, that the above captioned cases shall be reheard by the Court sitting en banc, on January 4, 1978, at 10:00 a.m., and it is
 
 
 70
 FURTHER ORDERED by the Court, en banc, sua sponte, that all parties participating in the reargument of this case en banc shall address themselves in particular to the jurisdictional issue and may file supplemental memoranda on that issue if they be so advised, on or before December 21, 1977, and it is
 
 
 71
 FURTHER ORDERED by the Court, en banc, sua sponte, that the opinion and judgment of this Court filed on August 15, 1977, are hereby vacated.
 
 
 
 *
 Mr. Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a). Mr. Justice Clark heard oral argument in this case but subsequently died and did not participate in the decision
 
 
 [1]
 Throughout the trial, the memorandum and order of the district court, and the briefs of the parties before this court, reference is made to Whalen's prior convictions for "robbery and rape." He was in fact indicted for robbery and rape, but was convicted of robbery and assault with intent to commit rape, a lesser included offense, by the verdict of the jury on May 23, 1963. While the trial judge's order of judgment and commitment erroneously related the offenses as "Robbery and Rape," United States v. Thomas W. Whalen, Crim.No. 895-62 (D.D.C. July 1, 1963), the conviction was affirmed on appeal by this court, which stated that the offenses were "robbery and attempt to commit rape." Whalem (sic) v. United States, 120 U.S.App.D.C. 331, 332, 346 F.2d 812, 813 (1965) (en banc), cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965)
 Similarly, reference is made by the parties to Whalen's commission of "murder" while a juvenile. He was accused of the homicide of an 80-year old woman in 1956 at the age of 13, but was judged of unsound mind and therefore civilly committed. 120 U.S.App.D.C. at 338, 346 F.2d at 819 (Bazelon, C. J., dissenting). While these inaccuracies would best have been avoided, no objection was made to them before the district court.
 
 
 [2]
 R. 49, Pltfs. Exhibit 9, J. App. 593-94
 
 
 [3]
 R. 49, Pltfs. Exhibit 6, J. App. 590-91
 
 
 [4]
 Tr. 313-14, 449
 
 
 [5]
 Tr. 249-52
 
 
 [6]
 R. 49, Pltfs. Exhibit 11, J. App. 598-99; R. 55
 
 
 [7]
 R. 49, Pltfs. Exhibit 10, J. App. 596-97
 
 
 [8]
 Tr. 258-59
 
 
 [9]
 R. 49, Pltfs. Exhibits 9 & 11, J. App. 595, 598-99
 
 
 [10]
 Tr. 267 (see note 1 supra ). The counselor testified at trial that had he been aware of these facts he still would have referred Whalen for employment at a place like McLean Gardens. He was impeached by contrary testimony in a deposition. Tr. 362-65
 
 
 [11]
 McLean Gardens is a large apartment complex occupying several city blocks in Northwest Washington, D.C. The complex consisted at the time of both buildings containing apartments and buildings containing dormitory rooms; Rebecca Rieser lived in a dormitory room in a building reserved for women. Tr. 421-22, 429-30, 439-40
 
 
 [12]
 McKinley Walker, the maintenance superintendent of McLean Gardens, who was responsible for hiring maintenance personnel, testified that his department at the time employed 4 or 5 parolees, including several who had been convicted of murder or robbery. Tr. 440-49. Walker testified, however, that Whalen had stated on his employment application that he had been convicted only of "assault," and that Walker would not have hired a man who had been "convicted of rape." Tr. 457-60
 
 
 [13]
 Tr. 272-73
 
 
 [14]
 Tr. 276-78, 317-18, 420. Abron's Field Sheet indicates that on March 23, 1972, he interviewed Whalen and Walker, and that the latter "agreed not to let the subj(ect) work by himself. He will be placed in the yard." R. 49, Pltfs. Exhibit 5, at 4
 
 
 [15]
 Tr. 425-26
 
 
 [16]
 Abron testified: "I informed the board that I considered Whalen to be a threat to the community and requested that he be removed from the community." Tr. 318. The letter, however, was signed by "W. H. Brown, Parole Supervisor." R. 49, Pltfs. Exhibit 14, J. App. 602-03
 
 
 [17]
 Tr. 318; R. 55
 
 
 [18]
 Tr. 318
 
 
 [19]
 Tr. 426-29, 434-36, 463-64; R. 49, Pltfs. Exhibit 22 (key log)
 
 
 [20]
 Tr. 323, 438
 
 
 [21]
 Tr. 277, 288-89
 
 
 [22]
 Tr. 387-90
 
 
 [23]
 Tr. 396-98
 
 
 [24]
 Tr. 398
 
 
 [25]
 Abron testified that this meeting took place on June 9, 1972. Tr. 327. Detective Chaney, however, stated that it occurred on June 5. Tr. 402
 
 
 [26]
 Tr. 327-30, 401-05
 
 
 [27]
 Tr. 330
 
 
 [28]
 Tr. 301-04, 476-86, 491-97, 515
 
 
 [29]
 Tr. 479-96
 
 
 [30]
 Tr. 465-66
 
 
 [31]
 Tr. 438-39
 
 
 [32]
 These facts were stipulated by the parties during trial, R. 38. Whalen was convicted of burglary, rape and murder based on the facts of this incident. United States v. Whalen, Crim.No. 56141-72 (D.C.Super. March 4, 1974), appeal docketed, No. 8583 (D.C.App. June 18, 1974)
 
 
 [33]
 The action was filed under the District of Columbia Wrongful Death Act, D.C.Code § 16-701 to -2703 (1973), and the Survival Statute, D.C.Code § 12-101 (1973)
 
 
 [34]
 Prior to December 1972, McLean Gardens was owned by McLean Gardens Corporation. In December 1972, McLean Gardens Corporation was merged into CBI Fairmac Corporation, and the latter assumed all of the liabilities and obligations of its predecessor. Complaint in No. 1311-73, R. 1 attachment, at PP 12-13
 
 
 [35]
 R. 1. That Rieser's claim against the District was based upon the theory of respondeat superior was made more clear in his amended complaint, filed March 17, 1975. R. 19, at PP 20-21. Rieser did not base his complaint on the actions of the Parole Board in declining to revoke Whalen's parole, apparently assuming that these acts were protected by sovereign immunity. This defense is discussed in Part IV.A infra
 
 
 [36]
 "Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332 (1970), in that there is a diversity of citizenship between Plaintiff and the Defendants and that the matter in controversy exceeds Ten Thousand Dollars ($10,000) exclusive of interests (sic) and costs." Complaint in No. 1690-73, R. 1, at P 1. An identical allegation was made in plaintiff's amended complaint, R. 19, at P 1
 
 
 [37]
 R. 9
 
 
 [38]
 R. 33
 
 
 [39]
 R. 34. When Rieser moved to dismiss his claims against Abron, the District represented that it would raise no defenses to the respondeat superior claim based on the absence of Abron. Tr. 4, 636. This concession was unnecessary, since the employee is not a necessary party to a suit against his employer under respondeat superior. See, e. g., Thomas v. Johnson, 295 F.Supp. 1025 (D.D.C.1968); 3A J. Moore, Federal Practice PP 19.11, at 2364-65; 19.18(2), at 2571 (2d ed. 1974). This concession by the District did not, of course, waive any right to challenge the court's jurisdiction. See Part III, infra
 
 
 [40]
 R. 46 at 11
 
 
 [41]
 The citizenship of the personal representative of the decedent is controlling for purposes of diversity of citizenship. See, e. g., Mecom v. Fitzsimmons Drilling Co., 284 U.S. 183, 186, 52 S.Ct. 84, 76 L.Ed. 233 (1931); 3A J. Moore, supra note 39, P 17.04 at 112-13 & n.8
 
 
 [42]
 E. g., Stone v. Stone, 405 F.2d 94, 97-98 (4th Cir. 1968); Jacobson v. Atlantic City Hospital, 392 F.2d 149, 153 (3d Cir. 1968); Wilson v. American Chain & Cable Co., 364 F.2d 558 (3d Cir. 1966). In each of these cases, jurisdiction was exercised over a claim against a party as to which the jurisdictional amount had not been met. Also see Moor v. County of Alameda, 411 U.S. 693, 713-14 & n.29, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973)
 
 
 [43]
 While municipal corporations are "citizens" of their respective states subject to suit in diversity, Illinois v. City of Milwaukee, 406 U.S. 91, 97, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); Cowles v. Mercer County, 74 U.S. (7 Wall.) 118, 122, 19 L.Ed. 86 (1869), states and their agencies are not "citizens" subject to diversity jurisdiction. Moor v. County of Alameda, 411 U.S. 693, 717, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); Postal Telegraph Cable Co. v. Alabama, 155 U.S. 482, 487, 15 S.Ct. 192, 39 L.Ed. 231 (1894)
 
 
 [44]
 427 U.S. at 19, 96 S.Ct. at 2422
 
 
 [45]
 Id. Cf. District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (District of Columbia is not a "State or Territory" subject to suit under section 1983). See generally Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Colum.L.Rev. 127, 140-42 (1977)
 
 
 [46]
 The Aldinger holding is not directly applicable to the case presently before us, since the petitioner in that case sought to base jurisdiction on 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983, while the present case involves common-law tort and diversity jurisdiction under 28 U.S.C. § 1332: "(W)e decide here only the issue of so-called 'pendent party' jurisdiction with respect to a claim brought under § 1343(3) and § 1983. Other statutory grants and other alignments of parties and claims might call for a different result." 427 U.S. at 18, 96 S.Ct. at 2422. Cf. Kroger v. Owen Equipment & Erection Co., 558 F.2d 417, 424-425 n.29 (No. 76-1187, 8th Cir. 1977) (quoting Aldinger, 427 U.S. at 18, 96 S.Ct. 2513, and distinguishing it from a case involving an ancillary claim by a plaintiff against a third-party defendant)
 Because it involved only a construction of § 1983, the Supreme Court's decision in District of Columbia v. Carter, supra note 45, 93 S.Ct. 602, similarly has no direct impact on the present case.
 
 
 [47]
 See note 43 supra
 
 
 [48]
 1 Stat. 73, 78
 
 
 [49]
 See National Mut. Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 586, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949)
 
 
 [50]
 Act of April 20, 1940, Pub.L.No.76-463, 54 Stat. 143
 
 
 [51]
 H.R.Rep.No.1756, 76th Cong., 1st Sess. 1 (1940)
 
 
 [52]
 The plurality noted that the legislative history of the 1940 amendment is sparse. The House Report consists of only four pages, containing the statement of purpose quoted in the text supra at note 51, and a discussion of the bill's constitutionality. The Senate Report contains only the recommendation that the bill be passed. S.Rep.No.1339, 76th Cong., 3d Sess. (1940). Each house passed the bill without debate. 86 Cong.Rec. 3015, 4286 (1940). See 337 U.S. at 589 n.17, 69 S.Ct. 1173
 
 
 [53]
 The 1948 change was part of the revision and enactment of Title 28 of the U.S.Code. Act of June 25, 1948, Pub.L.No.80-773, § 1332, 62 Stat. 869, 930. The Reviser's Notes indicate that the change was intended simply to clarify the original congressional intent underlying the 1940 amendment:
 The revised section removes an uncertainty referred to in (McGarry v. City of Bethlehem, 45 F.Supp. 385, 386 (E.D.Pa.1942)), as to whether Congress intended to permit citizens of the territories or the District of Columbia to sue a State or Territory itself rather than the citizens thereof. The court observed that "Congress could hardly have had such intention."
 Reviser's Note to 28 U.S.C. § 1332 at 7567 (1970). Thus, the 1948 change was intended simply to make it clear that the 1940 amendment did not grant to citizens of the District and the territories the right to sue states or territories in diversity. There is no indication that Congress had any affirmative intent to preclude the exercise of the district courts' pendent jurisdiction over the District.
 For a similar reason, Fifty Associates v. Prudential Ins. Co. of America, 446 F.2d 1187, 1191-92 (9th Cir. 1970) and Krisel v. Duran, 386 F.2d 179 (2d Cir. 1967) (per curiam), cert. denied, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968), cited by the District, are inapposite. Fifty Associates and Krisel held only that a state agency, like the state itself, was not subject to the diversity jurisdiction of the federal courts.
 
 
 [54]
 Cf. Aldinger v. Howard, 427 U.S. 1, 22-23, 96 S.Ct. 2513, 49 L.Ed.2d 511 (Brennan, J., dissenting); Note, Pendent Jurisdiction, supra note 45, at 142
 
 
 [55]
 Twentieth Century-Fox Film Corp. v. Taylor, 239 F.Supp. 913 (S.D.N.Y.1965). The District cites a number of cases for the proposition that complete diversity is required. Each case involved a party with the same citizenship as that of the plaintiff, and so is not inconsistent with the result we reach. See, e. g. Mobil Oil Corp. v. Kelley, 493 F.2d 784, 789 n.2 (5th Cir.), cert. denied, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974) (dictum); Seyler v. Steuben Motors, Inc., 462 F.2d 181 (3d Cir. 1972) (per curiam); Wolgin v. Atlas United Financial Corp., 397 F.Supp. 1003, 1008-10 (E.D.Pa.1975), affd. mem., 530 F.2d 966 (3d Cir. 1976)
 
 
 [56]
 United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)
 
 
 [57]
 Id. at 726, 86 S.Ct. at 1139
 
 
 [58]
 See, e. g., Rosado v. Wyman, 397 U.S. 397, 402-05, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Springfield Television, Inc. v. City of Springfield, 462 F.2d 21, 23-24 (8th Cir. 1972); Gray v. Heat Workers Local 51, 447 F.2d 1118, 1120 (6th Cir. 1971); Gem Corrogated Box Corp. v. National Kraft Container Corp., 427 F.2d 499, 501 n.1 (2d Cir. 1970)
 
 
 [59]
 See Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); Cowles v. Mercer County, 74 U.S. (7 Wall.) 118, 122, 19 L.Ed. 86 (1869)
 
 
 [60]
 Pub.L.No.93-198, 87 Stat. 774 (1973). Some parts of the Act became effective upon its enactment on December 24, 1973, while other parts became effective at later dates. Id. § 771, 87 Stat. 836
 
 
 [61]
 See Fifty Associates v. Prudential Life Ins. Co. of America, 446 F.2d 1187, 1191-92 (9th Cir. 1970); Krisel v. Duran, 386 F.2d 179 (2d Cir. 1967) (per curiam), cert. denied, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968), discussed in note 53 supra. Cf. text at note 55 supra
 
 
 [62]
 Rieser filed suit against Whalen and CBI Fairmac on June 28, 1973, and Fairmac filed its third-party complaint against the District and Abron on August 7, 1973. Rieser filed his separate action against the District and Abron, and moved for consolidation, on August 31, 1973. The district court retained concurrent jurisdiction with the Superior Court of the District of Columbia over civil actions involving amounts in controversy exceeding $50,000 filed during a transitional period ending July 31, 1973. District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L.No.91-358, § 111, 84 Stat. 477, as codified, D.C.Code § 11-501(4) (1973). Accordingly, Rieser's original complaint against Whalen and Fairmac asserted that the district court had jurisdiction under both D.C.Code § 11-501(4) and 28 U.S.C. § 1332. He now argues that since he could have pursued recovery directly from the District as third-party defendant in the original action against Fairmac, had that action not been dismissed, the court properly exercised jurisdiction over the action against the District ancillary to its statutory jurisdiction over the earlier action against Fairmac
 While a majority of the federal courts that have considered the issue have concluded that an independent jurisdictional basis is necessary to permit a plaintiff to pursue a claim against a third-party defendant, see Fawvor v. Texaco, Inc., 546 F.2d 636, and cases cited at 639 n.7 (5th Cir. 1977); Kenrose Mfg. Co. v. Fred Whitaker Co., 512 F.2d 890 (4th Cir. 1972), quoted in Aldinger v. Howard, 427 U.S. 1, 15, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the Eighth Circuit recently rejected this weight of authority and adopted the opposite view. Kroger v. Owen Equipment & Erection Co., 558 F.2d 417 (No. 76-1187, 8th Cir. 1977). Professors Wright and Miller argue on policy grounds that the latter view is preferable, 6 C. Wright & A. Miller, Federal Practice & Procedure § 1444, at 234-37 & n.1 (1971), and Professor Moore agrees. 3 J. Moore, Federal Practice § 14.27(1) at 14-570 to -572 (2d ed. 1972), quoted in Kroger, supra, 558 F.2d at 423 n.25. In the present case, we do not resolve this controversy.
 
 
 [63]
 Act of Feb. 21, 1871, § 1, 16 Stat. 419, as codified, D.C.Code § 1-102(a) (Supp. IV 1977)
 
 
 [64]
 District of Columbia v. Woodbury, 136 U.S. 450, 451-57, 10 S.Ct. 990, 34 L.Ed. 472 (1889); Barnes v. District of Columbia, 91 U.S. 540, 23 L.Ed. 440 (1876). Even earlier, the government of the District was held to the liability of a municipal corporation. Weightman v. Corporation of Washington, 66 U.S. (1 Black) 39, 49-53, 17 L.Ed. 52 (1861). Also see Johnston v. District of Columbia, 118 U.S. 19, 6 S.Ct. 923, 30 L.Ed. 75 (1886)
 
 
 [65]
 See, e. g., Calomeris v. District of Columbia, 96 App.D.C. 364, 226 F.2d 266 (1955) (public hospital); Capital Transit Co. v. District of Columbia, 96 App.D.C. 199, 202, 225 F.2d 38, 41 (1955) (police); Wilson v. District of Columbia, 86 App.D.C. 28, 179 F.2d 44 (1949) (municipal center); District of Columbia v. Totten, 55 App.D.C. 312, 314, 5 F.2d 374, 376, cert. denied, 269 U.S. 562, 46 S.Ct. 21, 70 L.Ed. 412 (1925) (prison); but cf. Scull v. District of Columbia, 102 App.D.C. 104, 250 F.2d 767 (1957), cert. denied, 356 U.S. 920, 78 S.Ct. 703, 2 L.Ed.2d 715 (1958) (water system); Smith v. District of Columbia, 89 App.D.C. 7, 10, 189 F.2d 671, 674 (1951) (streets). The latter, along with nuisances, see District of Columbia v. Totten, supra, were viewed as exceptions to the doctrine of nonliability for governmental activities. See Spencer v. General Hospital of the District of Columbia, 138 U.S.App.D.C. 48, 51 n.2, 425 F.2d 479, 481 n.2 (1969) (en banc)
 
 
 [66]
 See, e. g., Marusa v. District of Columbia, 157 U.S.App.D.C. 348, 484 F.2d 828 (1973) (police); Spencer v. General Hospital of the District of Columbia, 138 U.S.App.D.C. 48, 425 F.2d 479 (1969) (en banc, overruling Calomeris, supra note 65) (public hospital); Elgin v. District of Columbia, 119 U.S.App.D.C. 116, 337 F.2d 152 (1964) (schoolyard); Wade v. District of Columbia, 310 A.2d 857 (D.C.App.1973) (en banc) (police). Cf. Apton v. Wilson, 165 U.S.App.D.C. 22, 29-34, 506 F.2d 83, 90-95 (1974)
 
 
 [67]
 See, e. g., Elgin v. District of Columbia, 119 U.S.App.D.C. 116, 118-19, 337 F.2d 152, 154-55 (1964)
 
 
 [68]
 See Spencer v. General Hospital of the District of Columbia, 138 U.S.App.D.C. 48, 51, 425 F.2d 479, 481 (1969) (en banc); Elgin v. District of Columbia, 119 U.S.App.D.C. 116, 120-21, 337 F.2d 152, 156-57 (1964); Wade v. District of Columbia, 310 A.2d 857, 860 (D.C.App.1973) (en banc)
 
 
 [69]
 Wade v. District of Columbia, 310 A.2d 857, 860 (D.C.App.1973) (en banc)
 
 
 [70]
 Marusa v. District of Columbia, 157 U.S.App.D.C. 348, 484 F.2d 828 (1973); Thomas v. Johnson, 295 F.Supp. 1025 (D.D.C.1968)
 
 
 [71]
 Spencer v. General Hospital of the District of Columbia, 138 U.S.App.D.C. 48, 425 F.2d 479 (1969) (en banc)
 
 
 [72]
 The District argues, Reply Br. at 21-24, that whether or not Abron breached a ministerial duty in the first instance, this breach was cured when McLean learned of the information withheld and of the need for enhanced supervision of Whalen. Any further supervision by Abron, the District contends, was "discretionary." The first portion of this argument goes not to the sovereign immunity question but to the questions of breach of duty and proximate cause. The second part of this argument misconceives the term "discretionary" as discussed in text at notes 67-71 supra
 
 
 [73]
 Tr. 5-62; R. 55, 56
 
 
 [74]
 Tr. 48
 
 
 [75]
 The notice requirement "was designed 'to protect the District of Columbia against unreasonable claims,' and 'to give the District officials reasonable notice of the accident so that the facts may be ascertained and, if possible, the claim adjusted.' " Hurd v. District of Columbia, 106 A.2d 702, 704 (D.C.Mun.App.1954), quoting H.R.Rep.No.2010, 72d Cong., 2d Sess. 1-2 (1933). Accord, Hill v. District of Columbia, 345 A.2d 867, 869 (D.C.App.1975)
 
 
 [76]
 "The police report is an alternative form of notice added to '(take) care of those instances in which actual notice is had by the District of Columbia from the police department, although technical notice may not have been filed by the person injured.' " Miller v. Spencer, 330 A.2d 250, 252 (D.C.App.1974), quoting H.R.Rep.No.2010, 72d Cong., 2d Sess. 2 (1933) (emphasis by the Miller court)
 
 
 [77]
 Stone v. District of Columbia, 99 U.S.App.D.C. 32, 34, 237 F.2d 28, 30, cert. denied, 352 U.S. 934, 77 S.Ct. 221, 1 L.Ed.2d 160 (1956)
 
 
 [78]
 See Thomas v. Potomac Electric Power Co., 266 F.Supp. 687, 693-94 (D.D.C.1967). "(S)trict construction is not required for Section 309 because the District has no sovereign immunity from liability for the non-discretionary acts of its employees." Dellums v. Powell, 184 U.S.App.D.C. ---, ---, 566 F.2d 216, 229 (1977). But see District of Columbia v. World Fire & Marine Ins. Co., 68 A.2d 222, 225 (D.C.Mun.App.1949)
 
 
 [79]
 The district court took judicial notice of a summary police report compiled from the voluminous report on the case. This report was not made available to the appellee and is not part of the record herein. Tr. 14-15, 22-23, 591
 
 
 [80]
 Cf. Hurd v. District of Columbia, 106 A.2d 702, 704 (D.C.Mun.App.1954)
 
 
 [81]
 The two cases principally relied upon by the District are inapposite. In Miller v. Spencer, 330 A.2d 250 (D.C.App.1974), the court held that a police report did not constitute adequate notice of a personal injury claim because it had stated that the accident resulted only in property damage. In Brown v. District of Columbia, 304 A.2d 292 (D.C.App.1973) (per curiam) a police report was held not to constitute adequate notice of a false arrest claim. The court held that the police report setting out the circumstances of an arrest for carrying a dangerous weapon did not provide notice of injury to the arrestee or damage to his property. In contrast, the injury to the decedent in the present case was readily apparent in the police reports
 
 
 [82]
 See, e. g., Kline v. 1500 Massachusetts Ave. Apt. Corp., 141 U.S.App.D.C. 370, 439 F.2d 477 (1970); Palsgraf v. Long Island R. R., 248 N.Y. 339, 162 N.E. 99 (1928); W. Prosser, Handbook of the Law of Torts § 31, 145-49 (4th ed. 1971)
 
 
 [83]
 See Part IV.A supra. Some courts have viewed this principle of municipal "duty" as a strict rule based primarily upon municipalities' sovereign immunity from liability for torts committed in the performance of a "governmental" function. See, e. g., Gerneth v. City of Detroit, 465 F.2d 784, 786-87 (6th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 913, 34 L.Ed.2d 690 (1973); City of Tampa v. Davis, 226 So.2d 450 (Fla.App.1969). The Gerneth and Davis courts recognized an exception from this rule where there is some "privity" between the negligent city employee and the injured plaintiff, see 226 So.2d at 454-55, quoted in 465 F.2d at 786. This exception might explain the lack of concern for the problem of "duty" in the opinions of courts of this jurisdiction involving suits against the District based on police officials' inadequate training and supervision of police officers that injured the plaintiff. See Marusa v. District of Columbia, 157 U.S.App.D.C. 348, 484 F.2d 828 (1973); Thomas v. Johnson, 295 F.Supp. 1025 (D.D.C.1968)
 We do not, however, adopt this rationale. The courts of this jurisdiction have rejected the older "governmental-proprietary" test of municipal sovereign immunity in favor of the more modern "ministerial-discretionary" test. See Spencer v. General Hospital of the District of Columbia, 138 U.S.App.D.C. 48, 425 F.2d 479 (1969) (en banc); Elgin v. District of Columbia, 119 U.S.App.D.C. 116, 337 F.2d 152 (1964); and text in Part IV.A supra. It is therefore inappropriate in this jurisdiction to combine considerations of "duty" and "governmental" sovereign immunity as did the Gerneth and Davis courts. We thus consider the rule of municipal nonliability for the provision of public services to be a special application of the rule of foreseeability, and examine the considerations of duty and sovereign liability separately. See Hicks v. United States, 167 U.S.App.D.C. 169, 177-83, 511 F.2d 407, 415-20 (1975).
 
 
 [84]
 See, e. g., Massengill v. Yuma County, 104 Ariz. 518, 456 P.2d 376 (1969); Trautman v. City of Stamford, 32 Conn.Super. 258, 350 A.2d 782 (1975)
 
 
 [85]
 Simpson's Food Fair, Inc. v. City of Evansville, 149 Ind.App. 387, 272 N.E.2d 871 (1971). Also see Walters v. Hampton, 14 Wash.App. 548, 543 P.2d 648 (1975) (failure to arrest dangerous person with a gun)
 
 
 [86]
 See note 83, supra
 
 
 [87]
 167 U.S.App.D.C. at 177-83 & n.12, 511 F.2d at 415-20 & n.12. The court, however, quoted Professor Prosser's comment that "duty" and "proximate causation" are sometimes conclusory terms that are best analyzed as part of the broader concept of "negligence." 167 U.S.App.D.C. at 181 n.12, 511 F.2d at 419 n.12, quoting W. Prosser, supra note 82, at 325-26. The court considered "duty" in that case as part of the broader question of "negligence," but nevertheless considered proximate causation separately. On the facts of the present case, we conclude that separate consideration of the question of duty is also profitable
 
 
 [88]
 While the Federal Tort Claims Act is not applicable to the District of Columbia, see Spencer v. General Hospital of the District of Columbia, 138 U.S.App.D.C. 48, 53, 425 F.2d 479, 484 (1969) (en banc), St. Elizabeths Hospital is a United States government institution to which the indigent or dangerous insane of the District of Columbia may be committed, with reimbursement to the federal government by the District. See Fitzhugh v. District of Columbia, 71 App.D.C. 290, 291 n.2, 109 F.2d 837, 838 n.2 (1940); 24 U.S.C. § 161-222 (1970 & Supp. V 1975); D.C.Code §§ 32-401 to -416 (1973 & Supp. IV 1977)
 
 
 [89]
 Swanner v. United States, 309 F.Supp. 1183 (D.Ala.1970); Gardner v. Village of Chicago Ridge, 71 Ill.App.2d 373, 219 N.E.2d 147 (1966); Schuster v. City of New York, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958); Comment, Municipal Liability for Failure to Protect Informer, 59 Colum.L.Rev. 487 (1959); Annot., 46 A.L.R.3d 1084, 1091-94 (1972)
 
 
 [90]
 In addition, the District made no express objection on this basis to the district court's instructions on the issue of actionable duty. See note 92 infra
 We also note that while Rieser's complaint was based only on the alleged negligence of Abron, at trial he based his cause of action as well on the negligent omissions of Newman. See Tr. Sept. 17, 1975, 34-36. Since no objection was made to this line of argument, we assume that the case was tried on this theory by consent of the parties.
 
 
 [91]
 Schuster v. City of New York, 5 N.Y.2d 75, 81, 180 N.Y.S.2d 265, 269, 154 N.E.2d 534, 536 (1958)
 
 
 [92]
 Rieser counters that while the District styles this argument a challenge to the district court's conclusion that these issues should be submitted to the jury, it is actually a challenge to the court's instructions on causation. Since the District did not formally object to these jury instructions at the close of trial, Rieser concludes that the challenge is now barred by Fed.R.Civ.P. 51, which provides that:
 . . . No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. . . .
 Despite the unequivocal terms of Rule 51, various courts have recognized that there may be a "plain error" exception to this rule in exceptional circumstances. See, e. g., Morris v. Travosino, 528 F.2d 856 (1st Cir. 1976); Cohen v. Franchard Corp., 478 F.2d 115, 124 (2d Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973). Because we conclude that the district court's submission of the causation question to the jury was not error, we do not consider the proper characterization of the District's challenge or the existence or application of a plain error exception to Rule 51.
 
 
 [93]
 See Hicks v. United States, 167 U.S.App.D.C. 169, 482-83, 511 F.2d 407, 420-21 (1975); Becker v. Colonial Parking, Inc., 133 U.S.App.D.C. 213, 220 & n.35; 409 F.2d 1130, 1137 & n.35 (1969) and cases cited; F. Harper & F. James, The Law of Torts, § 20.5, at 1141-46 (1956); W. Prosser, supra note 82, § 44, at 286-88; Restatement (Second) of Torts §§ 435, 440-52 (1965)
 An "intervening force" is defined by Restatement § 441 as a force "which actively operates in producing harm to another . . . ." A "superseding cause" is defined as an intervening force that cuts off the liability of the first actor, § 440. Accord, Johnson v. Serra, 521 F.2d 1289, 1292 (8th Cir. 1975). Factors for determining whether an intervening force is a superseding cause are set out in § 442. The inactive failure to prevent a harm from forces set in motion by another may also be a superseding cause, § 452. While McLean Gardens' action in retaining Whalen in its employ involved some affirmative action, it is perhaps most accurately analyzed under § 452. The posture of the present case is somewhat unique, in that the intervening force alleged to supersede the defendant's liability is not the action of the party who inflicted the injury, cf. Hicks v. United States, 167 U.S.App.D.C. 169, 511 F.2d 407 (1975), but rather that of a third party who retained that person in a position where he could inflict the injury.
 
 
 [94]
 Restatement (Second) of Torts § 452 (1965)
 
 
 [95]
 See W. Prosser, supra note 82, at 288-89; Restatement (Second) of Torts § 452(2) & Comment (e) (1965)
 
 
 [96]
 W. Prosser, supra note 82, at 283
 
 
 [97]
 See, e. g., Lock v. Packard Flying Service, Inc., 185 Neb. 71, 173 N.W.2d 516 (1970); Hurt v. Charles J. Rogers Transp. Co., 164 Ohio St. 323, 130 N.E.2d 824 (1955); Drazen v. Otis Elevator Co., 96 R.I. 114, 189 A.2d 693 (1963)
 
 
 [98]
 See, e. g., Milwaukee & St. P. Ry. v. Kellogg, 94 U.S. 469, 474-75, 24 L.Ed. 256 (1877); Hicks v. United States, 167 U.S.App.D.C. 169, 182-84, 511 F.2d 407, 420-22 (1975); Hanna v. Fletcher, 97 U.S.App.D.C. 310, 316, 231 F.2d 469, 475 (en banc), cert. denied, 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501 (1956); Restatement (Second) of Torts § 434 (1965)
 
 
 [99]
 If the District believed that the information provided to McLean Gardens was sufficient to show that he was so dangerous that his employment should have been terminated, it was also incumbent on the Parole Board to revoke Whalen's parole. Rieser did not base any part of his cause of action upon the Parole Board's action, and its actions in any event would probably have been protected by sovereign immunity. See note 35 & text at notes 66-68 supra. Abron testified, however, that the Board on the two occasions when it refused to revoke Whalen's parole expressly warned Abron to increase his diligence in supervising Whalen. See text at notes 18 & 27 supra. These were facts which the jury could have found to increase Abron's duty of reasonable care
 
 
 [100]
 Punitive damages are generally awardable to punish tortfeasors and deter similar conduct, but only where the defendant's conduct was particularly outrageous, demonstrating reckless disregard for the rights of others. Mere inadvertence or even gross negligence is insufficient. See Nader v. Allegheny Airlines, 167 U.S.App.D.C. 350, 372, 512 F.2d 527, 549 (1975), revd. on other grounds, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); Chesapeake & Potomac Tel. Co. v. Clay, 90 U.S.App.D.C. 206, 194 F.2d 888, 891 (1952); Franklin Investment Co. v. Homburg, 252 A.2d 95 (D.C.App.1969); Jackson v. General Motors Acceptance Corp., 140 A.2d 699 (D.C.Mun.App.1958); W. Prosser, supra note 82, at 9-10
 
 
 [101]
 336 A.2d at 832 (footnote omitted)
 
 
 [102]
 Id
 
 
 [103]
 R. 20, 22
 
 
 [104]
 336 A.2d at 832, quoting Fisher v. City of Miami, 172 So.2d 455, 457 (Fla.1965)
 
 
 [105]
 See Lake Shore & Michigan S. Ry. v. Prentice, 147 U.S. 101, 107-08, 111, 13 S.Ct. 261, 37 L.Ed. 97 (1893); Woodard v. City Stores Co., 334 A.2d 189, 191 (D.C.App.1975); Dart Drug, Inc. v. Linthicum, 300 A.2d 442, 444 (D.C.App.1973); Washington Garage Co. v. Klare, 248 A.2d 681, 683-84 (D.C.App.1968); Safeway Stores, Inc. v. Gibson, 118 A.2d 386, 388 (D.C.Mun.App.1955), affd., 99 App.D.C. 111, 237 F.2d 592 (1956); District Motor Co. v. Rodill, 88 A.2d 489, 494 (D.C.Mun.App.1952)