Raymond G. RIESER, Administrator for the Estate and Personal Representative of Rebecca A. Rieser,

v.

DISTRICT OF COLUMBIA, Appellant, and Timothy Abron.

Raymond G. RIESER, Administrator for the Estate and Personal Representative of Rebecca A. Rieser, Appellant,

v.

DISTRICT OF COLUMBIA et al.

Nos. 76–1411, 76–1412.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Jan. 6, 1978.

Decided May 4, 1978.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, and Robert L. Chernikoff, Asst. Corp. Counsel, Washington, D. C., were on the brief for District of Columbia, appellant in No. 76–1411 and appellee in No. 76–1412.

Also Louis P. Robbins, Principal Asst. Corp. Counsel, Washington, D. C., entered an appearance for District of Columbia, appellant in No. 76–1411 and appellee in No. 76–1412.

Jerry L. Shulman, Washington, D. C., with whom Brendan V. Sullivan, Jr., Washington, D. C., was on the brief for Rieser, appellee in No. 76–1411 and appellant in No. 76–1412.

Before WRIGHT, Chief Judge, and BAZELON, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## JUDGMENT

This cause came on to be heard by the court on the record on appeal from the United States District Court for the District of Columbia, and briefs were filed herein by the parties and the cause was argued by counsel before the court sitting *en banc.*

On consideration of the foregoing, it is ORDERED and ADJUDGED by this court *en banc* that the opinion filed by the division of this court on August 15, 1977 which was vacated in accordance with the practices of this court when rehearing *en banc* was granted by order of November 7, 1977, is hereby reinstated except that same is modified and amended as follows: Part III, entitled "Jurisdiction," is stricken from said division opinion and the opinion of Judge McGowan which follows is inserted in lieu thereof.

Opinion for the Court filed by McGOWAN, Circuit Judge.

Concurring opinion filed by MacKINNON, Circuit Judge.

McGOWAN, Circuit Judge:

This appeal from the District Court involves a judgment in tort against the District of Columbia. After the judgment was affirmed by a panel of this court, we granted appellant's suggestion for rehearing *en banc*, asking the parties to address themselves particularly to the question of the District Court's subject matter jurisdiction. At the same time, we vacated the panel's opinion, *Rieser v. District of Columbia*, 183 U.S.App.D.C. 375, 563 F.2d 462, *vacated en banc*, 183 U.S.App.D.C. 405, 563 F.2d 482 (1977), which, by basing the District Court's power to decide the case on a theory of federal "pendent party" jurisdiction, had narrowed the District Court's dual predication of its jurisdiction on a federal "pendent party" theory *and* on federal diversity jurisdiction under section 1332 of the Judicial Code, 28 U.S.C. § 1332 (1970). Upon consideration of an argument pressed independently in this court for the first time *en banc*, we are convinced that the District Court had general jurisdiction over these local law claims pursuant to a provision of limited duration in the District of Columbia Court Reform and Criminal Procedure Act, Pub.L. 91–358, § 111, 84 Stat. 473 (1970), *codified in* D.C.Code § 11–501(4) (1973).

In these circumstances we do not find it necessary to resolve *en banc* either the merits of the local law issues or the existence *vel non* of federal jurisdiction. Consequently, we reinstate the panel opinion except for Part III, entitled "Jurisdiction," 183 U.S.App.D.C. at 382–387, 563 F.2d at 469–74, leaving the jurisdictional basis of the judgment appealed from as stated hereinafter.

I

Two sets of circumstances account for the multiple jurisdictional theories advanced in this case. First, plaintiff-appellee's search for actionable parties liable for the death of his daughter at the hands of a paroled criminal offender led him in 1973 to attempt to bring into the federal courts of the District of Columbia—the site of the tragedy—a large number of defendants, including the parolee himself, the firm employing him, the D.C. parole officer with responsibility over him, as well as that officer's employer, the government of the District of Columbia. Second, those efforts were proceeding at a time when the United States District Court for the District of Columbia was in flux, moving from possession of dual local and federal responsibility, *see O'Donoghue v. United States*, 289 U.S. 516, 545–46, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), to basically the same status as the United States district courts in the fifty states, *see Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973).

A.

On July 29, 1970, Congress enacted the District of Columbia Court Reform and Criminal Procedure Act, Pub.L. 91–358 ("The Reorganization Act") [hereinafter cited to relevant sections of the D.C.Code], which, in relevant part, began a progressive modification of the court system of the District of Columbia. That system, since 1801, *see* Act of February 27, 1801, 2 Stat. 103, *see also* Act of March 3, 1863, c. 91, 12 Stat. 762, had provided the only forum in the District for litigating almost all civil and criminal cases, whether premised on local or federal law. By 1970, however, the *city* of Washington, D. C. had grown into one of the major metropolitan centers in the United States, and its citizens were making tremendous demands on the unitary system of courts then consisting of the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit, as well as some purely local courts of quite limited jurisdiction. *See* note 1 *infra.* At the same time, people having business in the national *capital* at Washington, D. C. were also increasingly reliant on those courts for the determination of many important federal issues. Congress resolved "to relieve [the United States' courts] from the smothering responsibility for the great mass of litigation, civil and criminal, that inevitably characterizes the court system in a major city," by shifting such cases to "an

entirely new court system with functions essentially similar to those of the local courts found in the 50 States . . . ." *Palmore v. United States, supra,* 411 U.S. at 408–09, 93 S.Ct. at 1682, *citing* S.Rep.No. 405, 91st Cong., 2d Sess. 1–3, 5, 18 (1970); H.R.Rep.No.907, 91st Cong., 2d Sess. 23–24, 33 (1970).

In effecting this drastic rearrangement of jurisdiction, Congress did not immediately place the entire range of local matters on the shoulders of the newly organized local court system.[1] Instead, the transition was accomplished gradually, by leaving all cases filed within six months of enactment to be tried in the United States District Court and, thereafter, allowing the filing of certain enumerated types of local cases in those courts during eighteen- and thirty-month transitional periods, the last of which ended on July 31, 1973. D.C.Code § 11–501 (1973). *See id.* § 11–921(b) (withholding such cases from the jurisdiction of local courts during the relevant periods). *See generally* S.Rep., *supra* at 5–6. In devising this three-stage process, Congress took seriously Judge Harold Greene's warning that "[a] court is not a commodity that can be produced, full blown, like an electric appliance, [but] must grow in an orderly progression, by measured, natural sta[g]es." *Id.* at 5.

Among Congress' concerns in adopting a staged transition were the accurate prediction of the total number of judges necessary to staff the District of Columbia Superior Court and Court of Appeals once fully constituted, and the construction of facilities capable of housing them, as well as the appointment of highly qualified persons to those positions, and the expeditious estab-

lishment of an efficient local judicial system capable of rendering "swift and sure" justice in criminal cases. *Id.* at 5–17; Senate Comm. on the District of Columbia, *Statement of the Managers on the Part of the Senate Submitted Regarding the Conference Action Upon S. 2601,* 91st Cong., 2d Sess. 5 (1970) [hereinafter referred to as *Conference Statement*]. It is not surprising, therefore, that, besides probate, *see* D.C.Code § 11–501(3) (1973), the largest category of cases that were withheld from the new local courts until the final stage of reorganization was "civil action[s, with certain minor exceptions,] begun in the court during the thirty-month period beginning on such effective date wherein the amount in controversy exceeds $50,000." D.C.Code § 11–501(4) (1973).[2] Of all cases likely to confront a local judge, of course, those described in the just-quoted language are most likely both to require extraordinary amounts of the very judicial resources that Congress worried about providing immediately upon enactment and to interfere with the local judiciary's criminal justice responsibilities. As to such cases, in fact, Congress' concerns reached even beyond the thirty-month transition period. Thus, the lawmakers attempted roughly to predict how the cases filed in the local courts in the early months of existence would mature, and to increase judicial resources accordingly. *See* S.Rep., *supra* at 7. And, apparently to protect those predictions, Congress, even after the thirty-month period had run, prohibited transfer to the new courts of local cases begun in the federal courts if they would "justify a judgment in excess of $50,000." D.C.Code § 11–922(b) (1973).

---

1. A system of purely local courts, which, for example, exercised concurrent jurisdiction with the United States District Court over misdemeanors, divorce proceedings and civil cases with $10,000 or less in controversy, did exist in the District of Columbia before 1970. The decisions of these courts for the most part could be appealed to the District of Columbia Court of Appeals, from whence a discretionary review lay with the United States Court of Appeals for the D.C. Circuit. These local courts formed the core of the newly constituted and independent

local court system created in 1970. *See generally Palmore v. United States,* 411 U.S. 389, 392–93 n. 2, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); S.Rep.No.405, 91st Cong., 2d Sess. 5 (1970).

2. Cases falling into the eighteen-month transition period included major felonies, D.C.Code § 11–502 (1973), and civil suits involving the hospitalization, treatment, and commitment of mentally ill, mentally retarded, alcoholic, and drug-addicted persons. *Id.* § 11–501(2).

In sum, Congress, in the self-conscious exercise of its "plenary" power to legislate for the District of Columbia under Article I, § 8, cl. 17 of the Constitution, see *Palmore v. United States, supra* at 397, 93 S.Ct. 1670, S.Rep., *supra* at 17–18, conceived of the Reorganization Act as a means of creating a comprehensive, efficient and high-quality local judicial system for the District of Columbia. It chose, however, to make that system self-contained only gradually, and for a time to leave important parts of its jurisdiction, including suits such as the one involved in this case, in the United States District Court which, to that extent, continued to be vested with its long-standing general jurisdiction in law and equity.

### B.

On September 10, 1972, Becky Rieser was raped and murdered in her apartment by parolee Thomas Whalen. At the time, Whalen, whose prior criminal record included several convictions for assaults on women, was employed by CBI Fairmac's predecessor-in-interest, which operated the building where Ms. Rieser lived and which had provided Whalen with means of access to many of the rooms in the apartment complex. Plaintiff-appellee, Becky's father, on June 28, 1973, brought suit against CBI Fairmac and Whalen, both citizens of the District of Columbia, alleging negligent hiring and intentional tort and seeking damages under both the survivors and wrongful death provisions in D.C.Code §§ 12–101, 16–2701 to 16–2703 (1973). Being a citizen of Pennsylvania, Rieser invoked the jurisdiction of the District Court on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332 (1970). His complaint also relied on D.C.

Code § 11–501 (1973) for jurisdiction, both because his damage claim far exceeded the $50,000 minimum and because he filed a month and a day before the thirty-month transition period for such suits under that section had run.[3]

This latter provision became of crucial importance, in our estimation, on August 7, 1973, just after the thirty-month period ended, when CBI Fairmac filed a "Third-Party Complaint" against the District of Columbia (and its employee, parole officer Timothy Abron) identifying it (through Abron) as a decisive participant in the apartment owner's decision to hire Whalen, and, therefore, in any negligence that accompanied that hiring. Because the District of Columbia arguably cannot be sued under the federal diversity statute, see 28 U.S.C. § 1332(d) (according the District of Columbia, the Territories and Puerto Rico the status of states for purposes of the diversity jurisdiction statute); *cf. Krisel v. Duran*, 386 F.2d 179 (2d Cir. 1967) (holding that Puerto Rico, like a state, is not subject to federal diversity jurisdiction), and because the presence in the third-party suit of D.C. citizen CBI Fairmac and the District might be seen as destroying the total diversity that is requisite under section 1332, see *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), note 9 *infra* and accompanying text, the local jurisdictional fount in section 11–501 of the D.C.Code remained the least controversial basis for asserting jurisdiction over the District Government by way of the third party complaint.[4] That assertion was implicitly validated on August 27, 1973, when the trial court granted CBI Fairmac leave to file its

---

**3.** In fact, Rieser's damage claim, by surpassing $50,000, placed in suit outside the power of the newly formed local courts until the thirty-month period ended. See D.C.Code 11–921(b) (1973). Nonetheless, Rieser could have avoided the jurisdictional entanglements that have troubled this action by waiting a few weeks and filing suit in the local courts after July 31, 1973 in addition to or in lieu of his federal court action. Since the one-year wrongful death statute of limitations extended to September 10, 1973, such a course of action would not

have jeopardized his right to damages. See D.C.Code §§ 12–301(4), 16–2702 (1973).

**4.** In fact, CBI Fairmac's "Third Party Complaint" contained no jurisdictional claim, but instead apparently intended to rely on Rieser's own two-pronged assertion of jurisdiction. See Fed.R.Civ.P. 8(a)(1). The uncertain availability of two other jurisdictional hooks, pendent party and ancillary jurisdiction, is discussed 188 U.S.App.D.C. at pp. ———— & nn. 8–9, 580 F.2d at pp. 653–654 & nn. 8–9 *infra*.

third-party complaint under Fed.R.Civ.P. 14(a).[5]

CBI Fairmac's August 7 filing apparently provided Rieser with the first indication that liability for his daughter's death might extend to the District of Columbia. On August 31, 1973, just four days after the trial court's order accepting the apartment owner's third-party complaint, he filed his own complaint in the District Court against Abron and the District. He premised jurisdiction over both defendants on federal diversity jurisdiction under 28 U.S.C. § 1332 (1970).

For reasons that are not clear from the record before us, Rieser chose to style this August 31 pleading as a separate "Complaint for Negligence, Misrepresentation, and Punitive Damages," rather than as an original plaintiff's third-party complaint, as authorized by Rule 14(a). *See* note 5 *supra.* Nonetheless, by accompanying the complaint with a notice of related cases, *see* Rule 3–4(d) of the Rules of the United States District Court for the District of Columbia, and a motion to consolidate this action with the June 28, 1973 suit against CBI Fairmac, *see* Fed.R.Civ.P. 42(a), Rieser sought to accomplish the same objective as would a Rule 14(a) third-party complaint.

The trial court granted the consolidation motion on October 11, 1973—one day after the District filed its answer, which did not object either to the District Court's assumption of jurisdiction or to consolidation—and the parties entered a 23-month period of intensive pretrial discovery. Although scheduled to begin on September 9, 1975, the trial of the consolidated actions was postponed for a day to allow completion of a last-minute settlement agreement between Rieser and CBI Fairmac. With CBI Fairmac out of the case by reason of the settlement, the parties further streamlined the litigation the next day, as trial began, by agreeing to the dismissal of the two individual defendants, Whalen and Abron. Not until the trial had been under way for two days did the District raise an objection to the District Court's jurisdiction. Nonetheless, the district judge allowed the trial to proceed to a jury verdict of $201,633 against the District and to a judgment in which those damages, in light of the compensatory damages received in the settlement with CBI Fairmac, were remitted to $100,816.50 (plus $2,674.30 in stipulated wrongful death damages). In its final memorandum and order the District Court reaffirmed its jurisdiction as federal in nature, on both pendent party and diversity theories.

## II

Although at different stages of the litigation of this case, appellee has variously relied on one, two or three jurisdictional bases,[6] he finally settled upon a four-pronged

5. Fed.R.Civ.P. 14(a) provides that:

    At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him. The third-party plaintiff need not obtain leave to make the service if he files the third-party complaint not later than 10 days after he serves his original answer. Otherwise he must obtain leave on motion upon notice to all parties to the action. The person served with the summons and third-party complaint, hereinafter called the third-party defendant, shall make his defenses to the third-party plaintiff's claim as provided in Rule 12 and his counterclaims against the third-party plaintiff and cross-claims against other third-party defendants as provided in Rule 13. The third-party defendant may as-

sert against the plaintiff any defenses which the third-party plaintiff has to the plaintiff's claim. The third-party defendant may also assert any claim against the plaintiff arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff. *The plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff, and the third-party defendant thereupon shall assert his defenses as provided in Rule 12 and his counterclaims and cross-claims as provided in Rule 13.* . . . (Emphasis supplied).

6. Rieser claimed only diversity jurisdiction in his August 31 complaint against the District, although he had also claimed general § 11–501 jurisdiction in his June 28 complaint against

approach in arguing the case on rehearing before this court *en banc.* His four theories included:

(1) simple diversity jurisdiction under 28 U.S.C. § 1332 (1970), premised on Rieser's being a citizen of Pennsylvania and the District of Columbia's allegedly being a citizen of itself.[7]

(2) pendent party jurisdiction, under which the court's power to hear the plaintiff's claims against the District, absent some independent jurisdictional source, is appended to its clear diversity jurisdiction over the suit between Pennsylvania citizen Rieser and Maryland citizen Abron;[8]

CBI Fairmac. Before the panel of this court that originally heard this appeal, however, he argued diversity, pendent party, and ancillary jurisdiction.

7. As discussed earlier, 28 U.S.C. § 1332(d) (1970), on its face, seems to accord the District, for purposes of diversity jurisdiction, equality with the states, which are not subject to such jurisdiction. *E. g., State Highway Comm'n v. Utah Constr. Co.,* 278 U.S. 194, 199, 49 S.Ct. 104, 73 L.Ed. 262 (1929). *See Palmore v. United States,* 411 U.S. 389, 395–96 n. 5, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). Nevertheless, the legislative history of § 1332(d) is complex. Prior to 1940, citizens of the District could not invoke the diversity jurisdiction of the federal courts. *E. g., Hepburn & Dundas v. Ellzey,* 6 U.S. (2 Cranch) 445, 2 L.Ed. 332 (1805). In that year, Act of Apr. 20, 1940, c. 117, 54 Stat. 143, extended the diversity provision to allow suits "between citizens of different states, or citizens of the District of Columbia, the Territory of Hawaii, or Alaska, and any State or Territory." Because this provision arguably, but irrationally, *see McGarry v. City of Bethlehem,* 45 F.Supp. 385, 386 (E.D.Pa.1942), allowed citizens of the District or a territory, unlike citizens of the various states, to sue a state or a territory itself, the revisers of the Judicial Code rewrote the diversity statute to allow suits between "citizens of different States," and to define "States" to "include . . . the Territories and the District of Columbia," Act of June 25, 1948, c. 646, 62 Stat. 930, *now codified in* 28 U.S.C.A. §§ 1332(a)(1), 1332(d). *See* Reviser's Note, *following* 28 U.S.C.A. § 1332 (1966). In 1956, Act of July 26, 1956, c. 740, 70 Stat. 658, added Puerto Rico into the provision, now codified as 28 U.S.C. § 1332(d) (1970). Thus, although the words of the revised statute appear to put the District, as well as the territories and Puerto Rico, on a par with the states—unless the *municipality* of the District of Columbia is deemed a citizen of the federally controlled geographical entity by the same name, *see* Panel Op., 183 U.S.App.D.C. at 386, 563 F.2d at 473; *cf. Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (municipalities may be sued in diversity suits); *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (for some purposes, the District is treated as more like a municipality than a state)—the history of the modern provision is arguably silent as to

the District's potential status as a diversity litigant.

8. In *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), the Supreme Court held that in certain situations Congress cannot be understood to have authorized jurisdiction over claims against parties as to which no *independent source of jurisdiction exists.* The statutory-interpretation-based test applied in *Aldinger,* which avoided deciding whether Article III permits federal pendent *party* jurisdiction, *cf. United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (Article III allows federal pendent *claim* jurisdiction), asks whether "Congress in the statutes . . . conferring jurisdiction has . . . expressly or by implication negated [the] existence [of jurisdiction over the claim against the pendent party]." 427 U.S. at 18, 96 S.Ct. at 2422. Plaintiff Rieser has vigorously argued before us that Congress, far from having expressly negated diversity jurisdiction over the District, arguably may have authorized it under § 1332. *See* note 7 *supra.*

Assuming that Congress neither authorized nor expressly rejected such jurisdiction, however, the question of negation "by implication" remains. As to that question, commentators have wondered at the curious task put by *Aldinger* of deciding when Congress, by *failing to extend* federal jurisdiction over certain parties, nonetheless did not intend implicitly to *negate* jurisdiction over them. *See, e. g.,* Note, *Law-Tied Pendent Jurisdiction* —Gibbs *and* Aldinger *Reconsidered,* 87 Yale L.J. 627, 646–47 (1978). In any case, some post-*Aldinger* courts and commentators have found the requisite negative intent as to parties who do not meet one of the requisites of the federal diversity statute, *Fawvor v. Texaco, Inc.,* 546 F.2d 636 (5th Cir. 1977); Note, *Aldinger v. Howard and Pendent Jurisdiction,* 77 Colum.L.Rev. 127, 147 & n. 107; Note, 55 Texas L.Rev. 941, 949–50 (1977), and in other situations where legislative negation of jurisdiction is hardly express, *Aldamuy v. Pirro,* 436 F.Supp. 1005 (N.D.N.Y.1977); *Long Prairie Packing Co. v. Midwest Emery Freight System,* 429 F.Supp. 201 (D.Mass. 1977). On the other hand, the legislative intent, discussed in note 7 *supra,* behind the 1948 revision of 28 U.S.C. § 1332, although clearly aimed at negating all diversity jurisdiction over suits against states and territories, is silent as

(3) ancillary jurisdiction, by which the court's power to hear those same claims, again absent any independent jurisdictional source, is deemed ancillary to its jurisdiction over the suit involving the original plaintiff (Rieser), the original defendant (CBI Fairmac), and the third-party defendant (the District);[9] and

(4) local jurisdiction under D.C.Code § 11–501(4) (1973), on the theory that Rieser's action against the District was an instance of third-party practice arising out of his suit against CBI Fairmac and, as such, part of the "civil action" that he filed against the apartment owner well within the thirty-month transitional period provided by section 11–501(4) for "any civil action . . . wherein the amount in controversy exceeds $50,000."

## A.

As the panel opinion in this case notes, federal jurisdiction issues, such as those presented by the first three theories listed above, often present "controvers[ial]" and "difficult question[s]," Panel Op., 183 U.S. App.D.C. at 387, 563 F.2d at 474 n. 62, 473, that are best left unresolved, if the case permits. This course of action seems especially appropriate to us in deciding the present controversy, assuming it is susceptible of resolution under the Reorganization Act's limited continuance of general, local jurisdiction in the District Court. This is true both because of the peculiar difficulty of the three federal jurisdiction questions raised,[10] and because of the likelihood in the near future of additional guidance from the Supreme Court on two of those questions.[11] Hence, we initially address the question of D.C.Code section 11–501(4)'s application to this case; and, because we confidently answer that question in the affirmative, we decline to address the merits of the other three jurisdictional theories advanced by plaintiff.

Because plaintiff clearly alleged (and was awarded) the requisite amount in controversy under D.C.Code § 11–501(4) (1973), to take advantage of that provision's grant of jurisdiction he need only prove that his claims against the District embody a "*civil action* begun in the court during the thirty-month period [ending July 31, 1973]." That requirement itself breaks down into two parts: first, whether, by "civil action," the statute comprehends the range of third-party practice authorized by the Federal Rules of Civil Procedure, *see* Fed.R.Civ.P. 14; *see generally id.* Rules 13, 18–25; and, if so, whether Rieser's complaint against the District, vis à vis his June 28 complaint against CBI Fairmac, which was filed during section 11–501(4)'s thirty-month period of operation, falls within the third-party practice contemplated by the Rules. We examine these two questions in reverse order.

■ Although freighted with dangerous tactical implications,[12] we are convinced

---

**9.** Although the circuit courts and the commentators have engaged in a lively debate over federal ancillary jurisdiction, *compare Kenrose Mfg. Co. v. Fred Whitaker Co.*, 512 F.2d 890, 893 (4th Cir. 1972) *and* cases cited in *id., with Kroger v. Owen Equip. & Erection Co.*, 558 F.2d 417 (8th Cir. 1977), *cert. granted*, 434 U.S. 1008, 98 S.Ct. 715, 54 L.Ed.2d 749 (1978) *and* 3 J. Moore, Federal Practice ¶ 14.27[1], at 14–565 to 14–574 (2d ed. 1972), the Supreme Court in *Aldinger* suggested that it will treat ancillary jurisdiction in much the same way it treats

to any like intent regarding the District of Columbia. *See* Panel Op., 183 U.S.App.D.C. at 384–385, 563 F.2d at 471–72; Reviser's Note, *following* 28 U.S.C.A. § 1332 (1966); *cf. McGarry v. City of Bethlehem*, 45 F.Supp. 385, 386 (E.D.Pa.1942).

pendent party jurisdiction, 427 U.S. at 9–12, 96 S.Ct. 2413; *see* note 8 *supra*.

**10.** *See* notes 7–9 *supra*.

**11.** *See Kroger v. Owen Equip. & Erection Co.*, 558 F.2d 417 (8th Cir. 1977), *cert. granted*, 434 U.S. 1008, 98 S.Ct. 715, 54 L.Ed.2d 749 (1978) (holding in favor of an ancillary jurisdiction theory, in opposition to several other circuits that have addressed the issue); *Ayala v. United States*, 550 F.2d 1196 (9th Cir.), *cert. granted*, 434 U.S. 814, 98 S.Ct. 50, 54 L.Ed.2d 70 (1977) (holding that Article III prohibits pendent party jurisdiction).

**12.** Most obviously, of course, plaintiff's approach, at least as a matter of form, made his

that Rieser's August 31 pleading against the District, at least as perfected by the trial court's October 11 consolidation order under Fed.R.Civ.P. 42(a), amounted to a third-party complaint by the original plaintiff against the third-party defendant of the kind authorized by the third-party practice provisions in Fed.R.Civ.P. 14(a), *quoted in* note 5 *supra*. Thus, plaintiff's independent complaint *cum* Rule 42(a) consolidation motion circumvented no procedural requirement under Rule 14(a), and in fact fully accomplished the latter provision's design of securing joint trial of all of "plaintiff's claim[s] . . . arising out of the transaction or occurrence that [are] the subject matter of the plaintiff's claim against the [original defendant, *i. e.*, CBI Fairmac]." In light of the healthy spirit of practicality animating the Federal Rules, *see, e. g.*, Fed. R.Civ.P. 1, we see no need in this case to penalize a litigant for mislabeling a motion. *See* Fed.R.Civ.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

■ A more substantial problem is raised, we believe, by the other question that must be answered in plaintiff's favor before section 11–501(4) applies, that is to say, whether that provision's use of the "civil action" terminology comprehends such third-party practice as occurred in this case. On the one hand, the Federal Rules, which from their inception have applied in all of the District of Columbia courts, local and federal, establish that "[t]here shall be one form of action to be known as 'civil action.' " Fed.R.Civ.P. 2. The rest of the Rules go on to describe that "action" in a manner that reflects "the whole tendency of [modern] decisions . . . to require a plaintiff to try his . . . whole case," that is, all claims against all parties that

arise from the same set of facts, "at one time." *Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 320, 47 S.Ct. 600, 602, 71 L.Ed. 1069 (1927), *quoted in United Mine Workers v. Gibbs*, 383 U.S. 715, 725 n. 13, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 228 (1966). Third-party claims, including those by the original plaintiff against a third-party defendant, fall well within the Rules' concept of a "civil action." *See* Fed.R.Civ.P. 14. Moreover, *Gibbs* indicates that U.S.Const. art. III, § 2's concept of a "case," for federal jurisdictional purposes, comprehends not only the actions described therein, such as those "arising under this Constitution [and] the Laws of the United States" and those involving "controversies . . . between citizens of different states" but also other claims that "derive from a common nucleus of operative fact." 383 U.S. at 725, 86 S.Ct. at 1138.

■ On the other hand, *Gibbs* also noted that the Federal Rules were not intended by Congress to "expand the jurisdiction of federal courts," *id.* at 725 n. 13, 86 S.Ct. at 1138, suggesting that the term "civil action" when used in such jurisdictional provisions as 28 U.S.C. § 1331(a) (general federal question jurisdiction) (1970); *id.* § 1332(a) (federal diversity jurisdiction); and *id.* § 1343(3) (civil rights jurisdiction), may not cover as much territory as it does when used by the drafters of the Rules. *See Aldinger v. Howard, supra*. The question of what the term does mean in a given instance, therefore, becomes one of statutory interpretation in light of "the context, the purposes of the law, and the circumstances under which the words were employed." *Puerto Rico v. Shell Co. (P.R.)*, 302 U.S. 253, 258, 58 S.Ct. 167, 169, 82 L.Ed. 235 (1937), *quoted in District of Columbia v. Carter*, 409 U.S. 418, 420, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

suit against the District, which was filed after the thirty-month period, look more independent of the original, and timely filed, action against CBI Fairmac than would have been the case with a Rule 14(a) third-party complaint. As such, he jeopardized his ability to tie the latter suit to the former one for jurisdictional and

other purposes. Moreover, he did not file a protective suit in the local courts against all possible defendants at the same time as he filed against the District. Such a suit would have given him a fall-back, and jurisdictionally unassailable, alternative for the trial of the entire suit. *See* note 4 *supra*.

In argument before this court, the District of Columbia has reminded us that federal "[j]urisdictional statutes are to be construed 'with precision and with fidelity to the terms by which Congress has expressed its wishes' . . . ." *Palmore v. United States, supra*, 411 U.S. at 396, 93 S.Ct. at 1675, *quoting Cheng Fan Kwok v. INS*, 392 U.S. 206, 212, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968). In the present context, however, that general rule must be applied with a recognition of the limited relevance of the policies underlying it.

The narrow-construction rule grew up in the rarefied atmosphere of federal jurisdiction emanating from Article III of the Constitution, which limits the permissible potential scope of federal judicial power. U.S.Const. art. III, § 2. It is further mandated by Congress' refusal throughout this nation's history to grant the federal courts all of the limited powers that the Constitution would allow.[13] Underneath these constitutional and statutory limits on federal jurisdiction lies a history of unwillingness, predating the Constitution, to give an unelected national judiciary the power to interfere in local affairs. The overall interpretive environment just described in fact has prompted the federal courts themselves to develop self-governing rules designed for the most part to assure that those courts, while remaining available for the "vindicati[on of] every right given by the . . . laws . . . of the United States," F. Frankfurter & J. Landis, *The Business of the Supreme Court* 65 (1928), *quoted in Steffel v. Thompson*, 415 U.S. 452, 464, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), do not interfere with the state courts' far more general and pervasive role as the primary effectuators of state governmental policies. *E. g., Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

The confined interpretive environment surrounding federal jurisdiction has, however, little relevance in the context of the Reorganization Act. That piece of legislation was passed under U.S.Const. art. I, § 8, cl. 17, which, by giving Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District [of Columbia]," *id.*, has been interpreted to give the federal legislators the "plenary" power to "exercise all the police and regulatory powers which a state legislature . . . would have in legislating for state . . . purposes." [14] *Palmore v. United States, supra*, 411 U.S. at 397, 93 S.Ct. at 1676. Fur-

---

**13.** Thus, at various times in our history, Congress has refused the federal courts any responsibility for such important Article III heads of jurisdiction as, between 1802 and 1875, "Cases . . . arising under . . . the laws of the United States." U.S.Const., Art. III, § 2. Moreover, even in granting the types of jurisdiction envisioned by Article III, Congress has chosen to place restrictions not required by the Constitution, such as a minimum amount in controversy, *e. g.*, 28 U.S.C. §§ 1331, 1332 (1970); and its enactments have been judicially interpreted to have placed other restrictions on federal jurisdiction that are likewise not constitutionally required, such as complete diversity, *see Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *cf. State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530–31, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967), and municipal immunity from civil rights suits under 28 U.S.C. § 1343(3) (1970), *see Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**14.** Congress' power with respect to the District includes the ability to "vest and distribute the judicial authority in and among courts and magistrates, and regulate judicial proceedings before them, as it may think fit, so long as it does not contravene any provision of the Constitution of the United States." *Capital Traction Co. v. Hof*, 174 U.S. 1, 5, 19 S.Ct. 580, 582, 43 L.Ed. 873 (1899), *quoted in Palmore v. United States, supra*, 411 U.S. at 397, 93 S.Ct. at 1670.

In fact, in contrast to the limited Article III powers given Congress in establishing federal courts, clause 17 allows Congress "to legislate for the District in a manner [and] with respect to subjects that would exceed its powers . . . [even] in the context of national legislation enacted . . . under Art. I, § 8." *Id.* at 398, 93 S.Ct. at 1676. In other words, with respect to legislating for the District of Columbia, the Constitution does not even shackle Congress with the loose restrictions that govern its use of such powers as are contained in the commerce, taxing and spending clauses. *See, e. g., Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *Steward Machine Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). *But cf. National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

thermore, Congress has exercised its unquestionably greater authority virtually to its fullest extent, intending by the Reorganization Act to provide both "a detailed and comprehensive scheme for the creation of a local, unified modern court system for the District of Columbia," H.R.Rep. *supra* at 23, and "an unprecedented increase in local judicial resources." *Conference Statement, supra* at 5. In short, the Reorganization Act constructed close to the same type of court system with pervasive local responsibilities that many limits on federal jurisdiction, such as the *Younger* doctrine, *see Younger v. Harris, supra,* are designed to protect.

■ In light of the broad brush used in designing the Reorganization Act, there is no reason to assume that Congress intended to impose jurisdictional barriers on the "tendency of [modern civil procedure] to require a plaintiff to try his . . . whole case at one time." *Baltimore S.S. Co. v. Phillips, supra,* 274 U.S. at 320, 47 S.Ct. at 602, *quoted in United Mine Workers v. Gibbs, supra,* 383 U.S. at 725 n. 13, 86 S.Ct. 1130. In fact, a contrary intent must be inferred from the legislators' clear purpose to set up a comprehensive local judicial system of general jurisdiction.

■ Having set aside the limiting assumption that usually restrains the interpretation of congressional statutes conferring jurisdiction on the United States courts, we turn next to a more specific analysis of the legislative history and purposes of the Reorganization Act and particularly section 11–501(4). That analysis, we believe, demonstrates even more conclusively that section 11–501(4)'s phrase "civil action" should be given the same broad meaning that it has in the Federal Rules.

In choosing which local actions should remain in the federal courts the longest after 1970, Congress, as discussed above, *see* 188 U.S.App.D.C. pp. ——-——, 580 F.2d pp. 649–651, sought to increase gradually the caseload of the new D.C. local courts, and to assure efficient and high-quality adjudication throughout the court structure. Moreover, the new courts' first

and foremost task lay in alleviating perceived deficiencies in the District's criminal justice system. As such, large-scale and more likely complex civil litigation, that is to say, civil suits involving more than $50,-000, were to be in the United States courts if brought within thirty months, both to assure their proper adjudication in courts already able to handle them and to allow the new local courts to organize, be staffed, and to make significant headway in reducing the backlog of criminal cases in the District.

In this light, the third-party practice that large civil cases might well be expected to generate would logically be linked in Congress' contemplation to the original complaint as part of a comprehensive notion of a "civil action." This interpretation would discourage complex spin-offs from suits filed during the thirty-month interim period from inundating the new courts just after that period and thus from interfering with those courts' orderly growth and handling of criminal cases. Moreover, the Federal Rules, with their goal of "just, speedy, and inexpensive" adjudication, Fed.R.Civ.P. 1, as accomplished by the unification of the forms of action, *id.* Rule 2, and encouragement of joinder of claims and parties, *id.* Rules 18–25, are a logical analogy in effectuating the congressional goal of "efficient centralization of local jurisdiction," *Conference Statement, supra* at 5. That the Reorganization Act Congress has such an analogy in mind is further evidenced by its adoption of the Federal Rules for use in the newly formed Superior Court. *See* D.C. Code § 11–946 (1973).

Finally, since Congress attempted to predict the normal progress of suits likely to be filed in either set of courts, both of which adhered to the Federal Rules, and to apportion cases between the two accordingly, *see* S.Rep., *supra* at 5, and since it attempted to protect those predictions regarding large civil actions by preventing transfer of such actions from the old to the new courts, even after the thirty-month period, *see* D.C.Code § 11–922(b) (1973), 188 U.S.App.D.C. ——, 580 F.2d p. 650 *supra,* it would seem

especially plain that Congress intended third-party practice generated in the natural course of $50,000-plus suits to remain in the United States courts for their—and the original suit's—duration.[15]

■ For the foregoing reasons, we conclude that Rieser's complaint against the District of Columbia formed an integral part of one "civil action" brought for the purpose of assigning liability and awarding damages for the rape and murder of his daughter. Because that action commenced—with the filing in the District Court of his original complaint against CBI Fairmac on June 28, 1973—during the thirty-month period of the District Court's continuing service as a local court for such cases, it falls squarely within that court's local jurisdiction under D.C.Code § 11–501(4) (1973), and eliminates any need for this court to explore possible bases for federal jurisdiction. Accordingly, we continue our vacation of that part of the panel opinion dealing with federal jurisdiction, 183 U.S.App.D.C. at 382–387, 563 F.2d at 469–

74, but reinstate the remainder of the opinion in its entirety.[16]

*It is so ordered.*

MacKINNON, Circuit Judge, concurring:

I concur in the foregoing opinion except that while I agree we need not decide the question as to the amenability of the District of Columbia to diversity jurisdiction, I am not as doubtful that such jurisdiction exists. *Cf. Rieser v. District of Columbia,* 183 U.S.App.D.C. 375, 386, 563 F.2d 462, 473 (1977).

15. In oral argument, counsel for the District of Columbia attempted to refute this argument by analogy to a hypothetical case involving a statute of limitations, rather than a jurisdictional, timing issue. Counsel supposed that had plaintiff Rieser filed his complaint against the District after the statute of limitations had run (rather than, as here, after the thirty-month period of interim jurisdiction had ended), the District would have had a perfectly good defense, even if plaintiff had filed his original action against CBI Fairmac before the running of the statute of limitations. Counsel argues that the same result should obtain in this case.

Although the District appears to have stated correctly the law on the impact of Rule 14(a) on statutes of limitations, *see, e. g., Frankel v. Back,* 37 F.R.D. 545 (E.D.Pa.1965), *but see Adam v. Vacquier,* 48 F.Supp. 275 (W.D.Pa. 1942), *criticized in Litts v. Refrigerated Transport Co.,* 375 F.Supp. 675, 676–77 n. 3 (M.D.Pa. 1973), the analogy it draws therefrom to our jurisdiction case is not sound. Statutes of limitations impose substantive limits on liability designed to protect potentially culpable *parties* from the progressive amassing of contingent liabilities over time, and they establish a defense only upon affirmative pleading by their beneficiaries. *E. g., Choate v. United States,* 233 F.Supp. 463 (D.Okl.1964). Jurisdictional limitations, on the other hand, seek to protect *society at large* from the adjudication of legal

issues by judicial officers who are not deemed by Congress or the Constitution to be competent for the resolution of matters outside those boundaries, and, as such, the courts are responsible for effecting those limitations in the public interest, even if they are not raised by the parties. As we have shown, Congress clearly considered that the *public* interest in competent resolution of legal issues in the District of Columbia (as opposed to *defendant's* perhaps contrary interests, as might be reflected in a statute of limitations) required for a time that large civil suits—with all of their third-party appurtenances—begin and end in the preexisting courts. Accordingly, we are confident that the jurisdictional time limit in § 11–501(4) was not meant to bar the present suit.

16. Although we asked the parties in rearguing the case before this court *en banc* to concentrate on the jurisdictional issues raised, appellant District implored us to reconsider the merits as well. Those merits raise solely questions of local law as to which this court's opinion has only persuasive and not precedential value, *M.A.P. v. Ryan,* 285 A.2d 310, 312–13 (D.C.Ct. App.1971) (cases decided in the federal courts during the transitional periods have no precedential value), and we are consequently not disposed to reexamine *en banc* the panel's determination of those questions.